## THERM–O–PROOF INSULATION CO. v. SLAYTER & CO.
### No. 5399.

Circuit Court of Appeals, Seventh Circuit.
Dec. 21, 1935.

George W. Hansen, Sidney Neuman, and Joseph F. Devereux, Jr., all of Chicago, Ill., for appellant.

Charles B. Belknap, of Toledo, Ohio, and Lee J. Gary and Albert G. McCaleb, both of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

This suit was brought to enjoin infringement of appellee's patent, No. 1,728,-837, applied for September 30, 1927, and issued September 17, 1929, covering "Method of Heat Insulating." The court found for appellee, and an interlocutory, injunctional, and accounting decree was entered. Defendant appealed.

EVANS, Circuit Judge.

Patentee was most unfortunate in wording his claim. He entitled his patent "Method of Heat Insulating." His first claim starts with these words: "The method of building a wall whereby to increase the insulating and fire resisting properties thereof." From these two statements it is assumed that his was a process patent. The first paragraph of the specifications confirms this conclusion, for the inventor there says:

"This invention relates to method for heat insulating buildings and the like and refers more particularly to an improved process by means of which houses or other buildings already standing can be conveniently, economically and efficiently heat insulated although the invention in certain of its broader aspects is not limited to the heat insulation of buildings already constructed."

His second paragraph injects doubt and confusion into the study for there he says:

"Another object of the invention is to provide material which can be economically produced and applied in the walls of the building in the carrying out

of the method and which in addition to its heat insulation qualities will be fire-resisting."

This product was not the subject of the claim which was allowed. All product claims were disallowed. In the license contract which appellee offered in evidence in order to show extensive use, it is significant, however, that the royalty was on the product.

When the claim is carefully analyzed, we find it to be a hybrid. It begins as a process and ends like a product claim. We quote and analyze the single claim of the patent:

"What I claim as my invention is: The method of building a wall whereby to increase the insulating and fire resisting properties thereof without undue added weight, which comprises utilizing spaced apart walls of a building previously constructed as a form for receiving heat insulating material, (1) providing openings to afford access to the air spaces between said spaced apart walls, (2) inserting the outlet end of a conduit through said openings, (3) and forcing through the said conduit a comminuted heat insulating material, said material being of sufficiently light weight and devoid of free moisture content of sufficient amount to cause bulging or other injurious effects upon the exposed surfaces of said walls." (The numerals are inserted by the court.)

We are not without sympathy for counsel who is called upon to determine whether a process or a product claim best protects his client's discoveries. It is at times difficult for him as it is for us to decide this question. It is unfortunate that form should play any substantial part in determining the validity of a patent monopoly covering a patentable discovery.

In solving the problem it would seem safe for courts to assume that patent applications should be as liberally construed as pleadings, and we should endeavor to give effect to the pleader's good faith efforts to describe his discovery and secure protection therefor. Courts cannot, of course, add what is omitted or subtract that which is clearly inserted in the claim. In many cases it has been observed that what is not claimed is dedicated to the public. It would seem, however, a violent assumption to so infer even an implied dedication. The same conclusion is reached, however, but by better

reasoning, by holding that the claim is a contract between the Government and the patentee and bespeaks the agreement of the parties. Accepting as we do the view that additions and subtractions may not be made, we still believe a claim, like the one before us, may be construed so as to give effect to the efforts of the inventor and his solicitor. It may result in narrowing the claim, but we think it unfair to give it a construction which would result in its instant annihilation.

Undoubtedly, Slayter believed he had made a discovery and tried to describe it. Approaching the patent from this angle, we can view the claim as a process claim and restrict the last step to blowing the comminuted heat insulating material therein specifically described and it only. While novelty, if any there be, resides in the last step—the blowing of this particular material—yet validity will be accorded it, if we can find patentable originality in this step.

■ Turning to the claim as analyzed, the first words ending with "weight" merely describe the art—patentee's field of operation. The next clause is not so readily reconciled grammatically. We assume "which" is attached to the word "method." Again, the draftsman was describing the field of his operation—his art. Neither clause describes a step in the patented, or any, process. The next clause "providing openings to afford access to the air spaces between said spaced apart walls" is the first step of this process claim. It was old, well known, commonly used, and never could evidence more than mechanical skill. The second step, "inserting the outlet end of a conduit through said openings," was likewise anything but novel. The last step, "forcing through the said conduit a comminuted heat insulating material," was likewise old.

There was not a sign of inventive genius in providing an opening in a wall, or in inserting in said opening the outlet end of a conduit (a nozzle), or in blowing or forcing material through a conduit. Prior art need not be cited, but, if necessary, it is in the record. See, also, Powers-Kennedy Contracting Corp. v. Concrete Mixing, etc., Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278.

The only novelty, which may be asserted for this claim is in forcing the specified materials described as follows: "Said material being of sufficiently light weight and devoid of free moisture content of sufficient amount to cause bulging or other injurious effects upon the exposed surfaces of said walls."

"Comminuted material" is defined in the specifications as follows: "By the term 'comminuted material' is of course included various degrees of fineness but does not mean that the material is reduced to a powdered condition. In fact the particles are preferably of sufficient size to give a large body for the amount of weight."

Unfortunately for the validity of the claim, greater indefiniteness and more vagueness could hardly be found. It is so worded (accidentally or intentionally) as to catch an alleged infringer coming or going. But, fearful that the description be not sufficiently elastic, Slayter further says in his specifications: "While I have described one material and one method of applying it I do not wish to limit the method to the particular material mentioned, except as ultimately set forth in the claim."

Can we, in these words, find a product sufficiently described to permit us to say it is patentably novel? "Comminuted heat insulating material" is a broad and comprehensive term. "Heat insulating material" needs no definition. "Comminuted" is also pretty well understood. It means "reduced to minute particles," "pulverized." The prior art is loaded with descriptions of "comminuted heat insulating material." The patent originally had a claim covering the product which was rejected, the examiner saying:

" * * * The method claimed is not a 'method of heat insulating a building,' but is in reality a part of the process of building a heat insulating wall. The material is in such cases forced into the air spaces in the walls of a building. The process, if properly defined, is not considered a patentable one, aside from the composition, as the only method of using such compositions in this connection is placing or 'forcing' it into the space in question.

"Claims 1 to 7 are rejected as unpatentable over Orlovsky or O'Hara, which indicates the use of a similar composition in the same manner.

"Claims 8 to 11 are rejected as unpatentable over 'Orlovsky. Orlovsky describes a mixture of any available organic fibrous material, with lime, gypsum (plas-

ter of Paris) and a fungicide (potassium permanganate). In view of this art, no invention is seen in the substitution of any available fibrous materials such as corn cobs, paper, etc., in place of Orlovsky sawdust etc."

We, therefore, must find the words of limitation, if at all, in the succeeding clauses. The material is described "as being sufficiently light weight and devoid of free moisture content of sufficient amount to cause bulging or other injurious effects upon the exposed surfaces of said walls." Required specificity must be found in the adverb "sufficiently." It cannot be that the clause "sufficiently light weight to cause bulging or other serious defects" informs us of the kind of material one must use to comply with this step of the claim. Some walls will bulge easier than others depending on the material and construction. We recognize that a claimant may describe a product in terms of results, but to say that the material should be *sufficiently light* as to prevent bulging of walls is too general and vague to secure protection. Also, it is said, the material must be "devoid of free moisture content of sufficient amount to cause bulging or other injurious effects. * * *" The term "devoid of free moisture content of sufficient amount" is unfortunate. We assume that the words used are equivalent in meaning to "sufficiently devoid of free moisture so as to avoid bulging," etc.

Let us assume that weight and dryness of material are important factors in the material which is to be blown. How much dryness and how much weight would be "sufficient"? How can another comply with or avoid this step? Obviously, the material strength of the walls would be vital. Perhaps, the ease with which the blowing might take place would be affected by the weight of the material. Further discussion would be of no avail. Our conclusion is that the language is too general to warrant protection.

Moreover, such material was refused protection by the patent office when the product claims were eliminated.

Likewise, the steps outside of this last one were anticipated by this disclosure of Balduf.

In the Balduf patent (prior art) the following appears in the specifications:

"This material may also be blown in place as through a hose, for example in covering a ceiling which has a floor above it, the hose being introduced between the floor and the ceiling and the fibrous material discharged therefrom. In such case the layer formed may be sprinkled with a thin stream or spray of water which will form the desired crust."

In Powers-Kennedy Contracting Corp. v. Concrete, etc., Co., 282 U.S. 175, 180, 51 S.Ct. 95, 97, 75 L.Ed. 278, the court, speaking of a patent issued in 1915, said:

"The idea of moving fluids and solids through a pipe by air pressure or other fluid pressure is old, and was well known at the time of the alleged invention. Both granular and plastic materials had been so moved by devices quite similar to that of the patent. These covered a wide range, from lift-pumps for sand and sulphur, to apparatus for transporting muck, spoil, grout, and concrete. * * *

" 'The observations of common experience in the mechanical arts would lead one to expect that, once the feasibility of using "wet" concrete in building operations was established, the mechanical skill of those familiar with engineering and building problems would seek to make use of known methods and appliances for the convenient handling of this new building material.'

"Here it appears that the use of compressed air for conveyance of granular and plastic materials had long been known and practised; so that the cited case is clear authority against invention in the instant cases."

The product claims in the Balduf patent covered "a new insulating material which is easily handled as a dry filling agent" and which was blown into the space between the walls of the building. Its claim 1 describes "a dry, fluffy insulating composition comprising shredded paper and comminuted plaster in substantially the proportions that these materials exist in a plasterboard having a plaster core and paper covering sheets."

Another claim covered "comminuted wallboards having paper covers and hydrated gypsum cores, so that the composition is a light, fluffy mixture of partially hydrated gypsum and fibers."

An earlier German patent issued to Orlovsky described the material for filling empty spaces as follows:

"A filling material for use between walls and the like, consisting of comminuted peat, sawdust, and the like, thereby characterized, that the said organic materials are mixed with gypsum and powdered lime that has been slaked with potassium permanganate solution."

Zahn obtained a patent in 1904 on material which could be used to blow into the hollow walls of the building and thereby avoid disastrous fires, as follows: "A filling composed principally of infusorial or diatomaceous earth." For it he claims added virtues as follows:

"Said diatomaceous earth is highly refractory, and when put into the wall, floor, or ceiling, as stated, prevents any draft through the same. This prevents the fire from passing from one part of the building to another through the usual hollow portions of the walls or floors. The filling also affords protection against rats, mice, and vermin, as it is very light and powdery and when disintegrated serves to prevent the rodents or other vermin from making runways."

Still other material had been described and used before Slayter entered the field. While he did not limit himself thereto, Slayter described a material that might be used as follows: "finely comminuted corn cobs and paper mixed with plaster of Paris and zinc chloride and sufficient moisture to permit the handling of the material without unnecessary dust."

Confronted by such prior art dealing with the material to be blown, the vagueness and impossibility of the language of the claims which described the material to be blown, is emphasized.

Appellee has asserted extensive use of the patent to support its claim of invention. While we know of no better support for the validity of claims of a patent than wide-spread, generous support by those skilled in the art, or substantial tribute paid by others for a license, yet we are not satisfied that in the instant case there was the generous recognition of this invention which appellee asserts. To assert that licenses have been taken by various parties is not informative. The licenses speak for themselves. They are the best evidence of their contents. If there be any merit in recognition of the patentee as an inventor through the issuance of licenses, the court must make that deduction from the license rather than from licensor's conclusions respecting the license.

In this case one license was presented to the court. It called for the fixation of a price for the *product,* and said licensee was permitted to designate others as sub-licensees. True, there was a license to use this patent, but if there was any possible profit from the license, it arose out of the sale of the non-patented product. Even that clause was so drawn that it is impossible to say that the licensee called for the payment of a tribute to the patentee for the use of the patent. Extensive use, as before stated, is an important factor in determining doubtful cases, but extensive use cannot be established by a witness giving oral testimony as to conclusions respecting licensees where the licenses are not in evidence. It may be that a license is granted in consideration of a cross-license, and the extensive use is in no way attributable to the alleged invention covered by the claim sued on.

Moreover, in the instant case the doubt which must exist before extensive use becomes a factor is not present.

The decree is reversed with directions to dismiss the complaint.