## SLAYTER & CO. v. STEBBINS–ANDERSON CO., Inc. (STANDARD LIME & STONE CO., Intervener).

No. 21.

District Court, D. Maryland.
Jan. 23, 1940.

Bartlett, Poe & Claggett and J. Kemp Bartlett, Jr., all of Baltimore, Md., Lee J. Gary, of Chicago, Ill., and Gifford, Scull & Burgess, and Newton A. Burgess, all of New York City, for plaintiff.

Marbury, Gosnell & Williams and William L. Marbury, Jr., all of Baltimore, Md., and Kenyon & .Kenyon, Frederick Bachman, and Theodore S. Kenyon, all of New York City, for defendant.

Cook & Markell, and Charles Markell, all of Baltimore, Md., for intervener.

WILLIAM C. COLEMAN, District Judge.

This is a suit for infringement of a patent relating to a method for heat insulation of buildings, issued to one Games Slayter and by him assigned to the present plaintiff, Slayter & Company. The patent is known as reissue patent No. 19,929, reissued April 14th, 1936, upon application for reissue made January 22nd, 1936. The original Slayter patent No. 1,728,837 was issued September 17th, 1929, on application filed September 30th, 1927, and was held invalid by the Circuit Court of Appeals for the Seventh Circuit in Therm-O-Proof Insulation Co. v. Slayter & Co., 80 F.2d 557. The reissue patent, however, was held valid and infringed by the District Court for the Southern District of New York in Slayter & Co.. v. United States Insulation Corp., 20 F.Supp. 376. An appeal was taken but dismissed on appellant's motion, 2 Cir., 94 F.2d 41. There is no privity between the defendant in either of these cases and the defendant or the

intervener in the present case. The present defendant, Stebbins-Anderson Co., Inc., is a Maryland corporation and is engaged in the installation of rock wool for insulating buildings, the wool which it uses being manufactured by the Philip Carey Manufacturing Company of Cincinnati, Ohio, and this company has assumed the defense of this action on behalf of the defendant. The intervener, the Standard Lime & Stone Company, also a Maryland corporation, is a manufacturer and seller of unpatented rock wool for insulation. Its petition for intervention was granted upon a showing that this company and the Philip Carey Manufacturing Company manufacture and sell substantially similar unpatented rock wool; that such is installed by it and its customers in Baltimore and various other places, and by defendant and other users of rock wool manufactured by the Philip Carey Manufacturing Co.; that there is now pending against it in the United States District Court for the Northern District of Illinois, Eastern Division, a suit instituted by the present plaintiff since the institution of the present suit, alleging infringement of this same reissue patent of plaintiff; that the complaint in that Illinois suit is, except for changes in names and allegations as to venue and the like, identical with the complaint in the present suit; and that the defenses and issues in both suits are the same.

The necessary jurisdictional requirements are satisfied. Both the defendant and the intervener, hereinafter spoken of collectively as the defendants, deny both validity and infringement of the patent. By way of further defense, defendants assert that plaintiff is barred because of suppression of facts in the case which it brought, and in which it was successful in New York, namely, Slayter & Co. v. United States Insulation Corporation, supra. Also, defendants have filed a counterclaim by which is sought, in addition to a declaratory judgment that the patent is invalid and not infringed, an injunction against; and damages for maintaining an alleged unlawful system of licenses by using the patent to maintain, for a limited number of licensees, a monopoly in the manufacture and sale of unpatented material.

The invention embraced in the patent in suit is stated in the specifications as relating to a "method for heat insulating buildings and the like, and refers more particularly to an improved process by means of which houses or other buildings already standing, can be conveniently, economically and efficiently heat insulated although the invention in certain of its broader aspects is not limited to the heat insulation of buildings already constructed." Another advantage claimed for the invention is "to provide a material which can be economically produced and applied in the walls of the building in the carrying out of the method and which in addition to its heat insulation qualities will be fire resisting." The single claim of the patent, however, is a method and not a product claim, and is as follows: "The method of building a wall whereby to increase the insulating and fire-resisting properties thereof without undue added weight, which method comprises utilizing spaced apart walls of a building previously constructed as a form for receiving heat insulating material, providing openings to afford access to the air spaces between said spaced apart walls, inserting the outlet end of a conduit through said openings, and pneumatically forcing through the said conduit a finely divided but not powdered heat insulating and fire-resisting material, said material being substantially free from dust and of low specific gravity and of a size to provide a large body for the amount of weight and substantially devoid of free moisture content whereby said wall is heat insulated and rendered fire resistant without bulging or damage to the surface thereof or to decorations thereon."

Analyzing the claim, it will be seen that it calls for a method of (1) pneumatically forcing through (2) openings made in the inner or outer walls of the building, to afford access to the air spaces between such walls, (3) certain heat insulating material into such spaces. The particular material specifically described in the specifications of the patent consists of "corn cobs and paper in a ratio of one-half cubic foot each or by weight 9 lbs. of corn cob to 2 lbs. of paper, this being mixed with 9 lbs. of plaster of Paris and 2 oz. zinc chloride, lime or other suitable fungicide. The finely comminuted corn cobs and paper are mixed with the plaster of Paris and the zinc chloride in a machine which is not described in detail but made the subject matter of a separate application, and sufficient moisture is added to permit the handling of the material without unnecessary dust. The moisture content, however, is limited with reference to the self-absorption quality of the plaster of Paris; that is, the plaster of Paris being de-

hydrated gypsum, it will absorb up to 15% of its weight, and the moisture content of the insulating material should not materially exceed such 15% of the weight of the plaster of Paris content."

The original Slayter application contained not only process claims, that is, claims for a "method of heat insulating buildings", but also product claims for "heat insulating material for buildings." However, the Patent Office rejected all product claims, and the original patent No. 1,728,837 was allowed with a single method claim, the text of which is identical with the single claim of the reissue patent which is now before us, except that instead of the last clause beginning with the words, "and pneumatically forcing through the said conduit", the original claim contained the following: "and forcing through the said 'conduit a comminuted heat insulating material, said material being of sufficiently light weight, and void of free moisture content of sufficient amount to cause bulging or other injurious effects upon the exposed surfaces of said walls." On December 21st, 1935, this claim was held invalid by the Circuit Court of Appeals for the Seventh Circuit in the case of Therm-O-Proof Insulation Co. v. Slayter & Co., supra, on the ground that it was too vague and indefinite in its wording, and also lacked invention. The New York suit, also previously referred to, brought by the present plaintiff, Slayter & Co. v. United States Insulation Corp., supra, had been instituted on May 31st, 1932, that is, prior to the decision in the Seventh Circuit. Following this decision, the plaintiff, as has already been explained, applied for and obtained on April 14th, 1936, the reissue patent, and the New York litigation proceeded with respect to this patent.

Attention should also be directed to the fact that the specifications of the reissue patent are identical with the specifications of the original patent, with the single exception that the following sentence has been added to the description of the insulating material: "A material so prepared will be found to weigh not more than approximately 20 pounds per cubic foot."

Taking up the question of infringement, the proof is clear that the present defendants do not infringe plaintiff's patent, because defendants use rock or mineral wool in their process, which is not, in our opinion, to be treated as the equivalent of the material specified in the Slayter patent. We find that the two materials are different in (1) character, both chemical and physical, and (2) method and immediate result of application.

Mineral wool is a common, generic term, often used synonymously with rock or glass wool which, more correctly speaking, are two types of mineral wool made in this country. The more common kind is glass wool, which is obtained by mixing certain kinds of stone with molten slag from blast furnaces, and converting the whole mass into a fibrous state. It is free from iron. The appearance of the finished product is very much like wool, being soft and fibrous. It appears in a variety of colors, but is more often white, although some times yellow and gray, and occasionally quite dark. The color, however, is no indication of its quality. The other kind,—rock wool,—is made from granite rock raised to 3000° F. and is free from sulphur. It is the only true manufactured "wool". It has the same general appearance as that made from slag and is white. Both of these materials consist of a mass of very fine, pliant but inelastic, vitreous fibers, interlacing in every direction and forming an innumerable number of minute air cells. Their great value in the insulation of buildings lies in the number of air cells which they contain, their consequent non-conduction of heat and fire-resisting qualities. In wool made from common slag, 92% of the volume consists of air held in minute cells, while in the best grade the proportion of air reaches as high as 96%. This confined air makes it one of the best, if not the best, of the non-conductors of heat. Aside from these qualities, it is very durable and contains nothing that can decay or become musty. See Kidder-Parker Architects' & Builders' Hand Book, 18th Ed. (1931), pp. 2024–25.

The Standard Chemical & Technical Dictionary, by H. Bennett, (1939), defines mineral wool as meaning slag wool and rock wool. It defines slag wool as "an artificial product of the blast furnace made by blowing air through slag; gr.-yel. filaments; used in packing and insulation." It defines rock wool as "an insulating material made from argilaceous lime stone", argilaceous meaning like clay in substance. It defines glass wool as "very fine strands of glass, resembling wool in appearance, used in insulation." One or more of these types are often described as being "nodulated", which means that they are composed of lumps or nodules. Also, there are two other types, (1) granulated rock wool, and (2) granulat-

ed rock cork. The first of these is manufactured by causing a blast of air or steam to impinge upon a molten stream of rock, which fiberizes it. The resultant loose material is then passed through a thresher to sub-divide it, and the sub-divisions are then rolled into granules by passing the material through a rotating cylindrical screen. The other material just referred to, namely, granulated rock cork, is nothing but rock wool mixed with an asphalt binder and formed into sheets, after which these sheets, or the trimmings therefrom, are ground up.

It is at once obvious that plaintiff's material, as specified in the patent, has none of the aforegoing characteristics of any of the various kinds of mineral wool. It consists of corn cobs, comminuted or chopped up, mixed with plaster of Paris, zinc chloride and water, the plaster of Paris being dehydrated gypsum. Mineral wool fibers are non-inflammable. The corn cobs and comminuted paper of plaintiff are inflammable. Mineral wool is a homogeneous material, its fine interwoven fibers being entangled together, forming a light material, almost woolly in texture, of a uniform nature; whereas the plaintiff's material is a non-homogeneous mixture, having somewhat the appearance of chicken-feed. Mineral wool weighs approximately 5 to 9 pounds per cubic foot, while plaintiff's material is much heavier, averaging 17 to 20 pounds per cubic foot. Mineral wool contains no free moisture, while Slayter's material contains, according to the patent specifications, moisture not materially in excess of 15% of the weight of the plaster of Paris content, which, however, was increased to 50% or 60% by Slayter's own practice in producing the mixture and blowing it damp, in order to avoid dust. The individual fibers in mineral wool are solid, whereas the comminuted corn cobs in Slayter's material are cellular. Thus, from both a chemical and physical point of view, it is too clear to require further analysis that the two materials are entirely different. Therefore, although Slayter in his specifications does not restrict himself to the particular material described, stating that "while I have described one material and one method of applying it, I do not wish to limit the method to the particular material mentioned, except as ultimately set forth in the claim," such a saving clause cannot in law make something an equivalent which is not, in fact, an equivalent, or permit Slayter to read into his patent, as a substitute or alternative material, something which is not

even remotely suggested by his specifications. Obviously, it does not suffice to say that the two materials are equivalents because they produce identity of result with respect to their insulating qualities.

In addition to being essentially different in their chemical and physical properties, the method and immediate result of applying the two materials are also essentially different. Slayter's material is damp when blown, and when put in place it cakes or "sets", due to the chemical change resulting from the inter-action of the plaster of Paris and the water, forming gypsum; that is to say, it "sets", just as does plaster in a cast or concrete in a form. In other words, a chemical reaction takes place and produces a partially solid mass. On the other hand, mineral wool is entirely dry at all times. No water is applied to it in the blowing. It undergoes no chemical reaction. No change whatsoever takes place in it during its application to, or after it is placed in, a wall. It does not "set" or harden.

Slayter's claim begins with the phrase "the method of building a wall * * *" etc. This serves to emphasize the difference between the Slayter and the defendants' material, for the walls of a building may be said to be a "form" for receiving the Slayter material, akin to a form constructed for receiving poured concrete. In the case of both the Slayter material and the concrete, the material can properly be said to "set" in the form, but nothing of this kind takes place when the defendants' material is blown.

In addition to all of the aforegoing, perhaps the most conclusive evidence that the two materials are not equivalents is to be found in the testimony of Slayter himself in the present case, to the effect that he well knew the properties of mineral wool at the time he was working upon his alleged invention, but rejected this material because he found it unsatisfactory for the attainment of his objectives.

The evidence in the present case discloses that the kind of mineral wool used by the United States Insulation Corporation and found to infringe in the New York suit, Slayter & Co. v. United States Insulation Corp., supra, if not identical with, was at least substantially the same as, the mineral wool used by the present defendants.

This Court thus finds itself in disagreement with the finding of Judge Woolsey in the New York case with respect to in-

fringement. Counsel for the defendants here have strenuously urged that Judge Woolsey would not have found as he did had it not been for suppression of the complete facts on the part of the plaintiff in the course of the proceeding before him. We find it unnecessary, however, to go into this argument. Suffice it to say that at least this much is true, as appears from the testimony and admissions in the present case, namely, that, for whatever reason, Judge Woolsey was not afforded the same opportunity as has been afforded this Court, to make a thorough, visual examination and comparison of the materials involved in the litigation, including the opportunity to witness the manufacture, in open Court, of the material called for by plaintiff's specifications, precisely according to the specified formula.

The Patent Office had found that there was no invention in Slayter's material, and therefore it rejected his product claims. In the litigation in Illinois, culminating in a finding by the Circuit Court of Appeals for the Seventh Circuit that Slayter's original patent was void (Therm-O-Proof Insulation Co. v. Slayter & Co., supra), infringement was conceded, even though it appears that the mineral wool used by the defendant in that case was substantially the same as the mineral wool used by the present defendants. So, little help is found in the Illinois decision on the specific problem to which we are now addressing ourselves. Turning then, again, to Judge Woolsey's opinion, it appears that after resting his finding of validity upon the fact, as he found, that what Slayter had done was entitled to the dignity of a patent in that he had combined with old elements an insulating material which was new, namely, had devised this material and combined it successfully with old methods of installation to achieve a new and very useful result, he proceeded to treat the Slayter material and mineral wool as one and the same thing through what he defined as "commercial evolution", based, as he states, upon "wide commercial success of Slayter's invention" [20 F.Supp. 380], which clearly is not supported by the evidence in the present case. On this point Judge Woolsey said, and we quote at considerable length from his opinion (20 F. Supp. at pages 379, 380):

"X. It was with his insulating material, therefore, that Slayter turned the scale in his favor, cf. Dow Chemical Company v. Williams Bros. Well Treating Corporation [10 Cir.], 81 F.2d 495, 497, 498, Tolfree v. Wetzler [3 Cir.], 25 F.2d 553, 554, and, although the steps which he claims for inserting it into the spaces between the inner and outer walls of houses are old, he is entitled to a patent for his 'method of building a wall' with that material, of which the commercial success is decisively corroborative of my opinion that by his conception as embodied in his patent he has added something of value to the art of insulation.

"For, if the question of patentability be deemed to be nicely balanced in this cause, the casting consideration in determining that issue is the commercial success of Slayter's material which was prompt and considerable.

"Some fifteen other houses were satisfactorily insulated with plaintiff's material soon after it was devised, and many important companies promptly took out licenses under Slayter's patent. Among the licensees were such companies as Johns-Manville Company, Eagle-Picher Lead Company, Grand Rapids Plaster Company, Tennessee Rock Products Company, Capitol Lime & Cement Company of Baltimore [apparently a misnomer for the present intervenor-defendant], General Insulating & Manufacturing Company, and—latest of all—the United States Gypsum Company, owner of the Balduf patent.

"The Grand Rapids Plaster Company used Slayter's material up to some time in 1935, when mineral or rock wool was made in lighter weights and nodulated so that it could be blown. Whereupon it, and also nodulated glass wool, a new product, came to be used by many of the plaintiff's licensees in their house-blowing operations under the patent, and, as these materials achieve the same purpose as Slayter's material in substantially the same way, they have now practically superseded it for such use. Without any attempt at a thorough census, the evidence shews that upwards of 87,000 houses have been 'blown' by plaintiff's licensees since Slayter secured his patent.

"XI. When in one of the useful arts many different men are engaged in seeking the same or a similar objective for its improvement, it is the man who first takes the final forward step which causes the embodiment of his conception—whether it be a process, a product, or a device—to emerge, by reason of its intrinsic merit,

from the twilight zone of experiments and approximations into the sunlight of commercial success, who is entitled to an inventor's status. The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Wiler), 143 U.S. 293, 12 S.Ct. 450, 36 L.Ed. 154; Magowan v. New York Belting & Packing Co., 141 U.S. 332, 343, 12 S.Ct. 71, 35 L.Ed. 781; Consolidated Safety-Valve Co. v. Crosby Steam-Gauge & Valve Co., 113 U.S. 157, 179, 5 S.Ct. 513, 28 L.Ed. 939; Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177.

"Slayter took his final forward step in the art here under discussion and, consequently, the plaintiff, as his assignee, is entitled to protection in the practice of his patent.

"XII. The wide commercial success of Slayter's invention has led, as above mentioned, to the contrivance, through the operation of what may be called commercial evolution, of insulating materials—nodulated rock, mineral, or glass wool—which have proved convenient and adequate equivalents for the material of his patent.

"Nodulated mineral, rock, or glass wool is now used for blowing insulation by most of the plaintiff's licensees.

"Mineral wool is used by the defendant company which is not licensed by the plaintiff.

"The use of these materials by the plaintiff's licensees is commercial proof that they are equivalents to—perhaps, in some ways, improvements on—the insulating material of Slayter's disclosure. Thus they conclusively bridge the gap between the plaintiff's patent rights and the defendant's infringement thereof, cf. Fleischer Studios v. Ralph A. Freundlich, Inc., (D.C.) 5 F.Supp. 808, 809, for by Slayter's specifications he expressly did not limit his monopoly to his disclosed insulating material, but left open the question of equivalents, cf. Paper Bag Patent Case (Continental Paper Bag Co. v. Eastern Paper Bag Co.), 210 U.S. 405, 418, 28 S.Ct. 748, 52 L.Ed. 1122, and his claim was broad enough to cover the nodulated mineral or rock wool used by the defendant, which was not a substance known and used in that form for insulation when Slayter got his patent."

That Slayter's material was neither commercially successful nor may properly be treated as the precursor of the mineral wools that subsequently did become commercially successful for insulating purposes, is clearly demonstrated by the evidence in the present case of what Slayter and the licensees under his patent actually did.

Shortly after the original Slayter application for a patent was filed on September 30th, 1927, Slayter licensed the so-called Kalkite Company to manufacture and to install, by pneumatic power, the material described in his application. This company satisfactorily insulated some fifteen houses with this material, but this soon ceased to be profitable and the business was discontinued. Later, but before his patent was actually issued, Slayter started another operating company, known as the Indiana Insulation Company. The Grand Rapids Plaster Company manufactured Slayter's material for this Indiana Company, and a license issued May 17th, 1930, to the Grand Rapids Company was apparently the first, or one of the first, licenses granted under the patent. Meanwhile, however, in 1928 one Henry J. Burt, who had been employed by the Kalkite Company for some time previously, started business for himself as the Wall-Fill Company, and became associated with the Johns-Manville Company. For a number of years thereafter, Burt was employed to do installation work by the Johns-Manville Company with rock wool that company furnished him, installing the material by pneumatic power in the same way that he had previously installed Slayter's material when he was with the Kalkite Company. Later, when the Johns-Manville Company took a license from the plaintiff under its patent, the Wall-Fill Company received a sub-license from the Johns-Manville Company and insulated approximately 7,000 houses by pneumatic power with Johns-Manville Company's rock wool; and the latter company has, through its various customers and dealers, insulated, up to the present time, some 80,000 houses in the same manner.

This evidence is similar to the evidence referred to in Judge Woolsey's opinion, as to which he says, (20 F.Supp. at page 380): "Without any attempt at a thorough census, the evidence shows that upwards of 87,000 houses have been 'blown' by plaintiff's licensees since Slayter secured his patent." But we cannot agree, upon the evidence that has been presented to us, with the subsequent statement in Judge Woolsey's opinion, included in the quotation already given, that the use of the

Johns-Manville rock wool, or the wool of any of the other contemporary licensees of the plaintiff, was an equivalent of, or an improvement upon, the insulating material of Slayter's disclosure. We have already pointed out how distinctly different the materials are in chemical and physical characteristics, as well as in operation. Allusion has also been made to the fact that Slayter himself recognized that mineral wool was well known at the time of his invention, but he discarded it as not being satisfactory for his purposes. It then seems unnecessary to go into an analysis of the extent to which mineral wool had previously been used for insulation purposes. In the present case, manufacturers of mineral wool testified that material, substantially the same as that used today, was known and in use for insulating purposes long prior to Slayter's invention. Indeed, it is stipulated in the present case that, over twenty years ago, mineral wool was applied as a filler to the hollow spaces between the inner wall of lathe and plaster and the outer wall of sheathing, of at least two residences in Salem, Virginia. While it is true this mineral wool was not applied pneumatically, the method of application is of more importance with respect to the question of validity of the Slayter patent which is hereinafter considered, than with the immediate question of infringement. Likewise, it is stipulated that prior to 1926, mineral wool had been placed in the hollow walls of many other buildings, including the old mansion of George Washington, at Mt. Vernon, Virginia.

■ Summarizing the aforegoing, it thus appears that mineral wool and the Slayter corn cob and plaster of Paris combination are not equivalents. This means that Slayter's patent, assuming it to be valid, must be limited to use of the material specified in the patent or to something that is, in fact, an equivalent thereto, and that, therefore, the patent is not infringed by the use of mineral wool. A different conclusion, namely, that the two materials are substantial equivalents, would of necessity result in finding that Slayter's patent is invalid, because the claim and the catch-all clause of the specifications, hereinbefore quoted, are couched in such broad terms as to cover what was known and used in the same way for the same purpose in the prior art.

There still remains the question whether the Slayter patent is valid, even when restricted to the use of the particular Slayter material, or an actual equivalent. This question we will now consider because, although it would be sufficient, having found non-infringement on the part of the defendants, to dismiss the bill of complaint on this ground alone, nevertheless, in view of the pleadings and the extent and character of related litigation, and the importance to the large industry affected, we deem it desirable to pass upon the question of validity also.

Defendants claim that the Slayter patent is invalid on at least five grounds: (1) the claim is anticipated by the known processes of blowing mineral wool, granulated cork, concrete, etc.; (2) Slayter's method involved no invention over these known blowing processes, which if not literally anticipatory, were fully analogous; (3) the patent claim is broader than, and not responsive to or supported by the method prescribed in the specifications; (4) the patent claim is vague and indefinite; (5) absence of proof of any "inadvertence, accident, or mistake" in the original patent as required by the reissue statute, 35 U.S.C.A. § 64, and hence no justification for the reissue patent in suit.

■ Considering these grounds in the order named, what has heretofore been said under the subject of infringement would appear to be sufficient proof of the soundness of the first two grounds. In addition, testimony was introduced which was undisputed, showing that the process of granulating and blowing mineral wool into storage bins or similar confined spaces, was known long before Slayter's alleged date of invention, December, 1926, and also, that this wool was substantially the same in its physical characteristics as the material used by the defendants today. Also, there is uncontradicted testimony that the same process as that employed by defendants was employed at Newport News and elsewhere, long prior to Slayter's alleged invention, for the purpose of insulating vessels, the only difference being that granulated rock cork was used instead of granulated mineral wool. In Slayter & Co. v. United States Insulation Corp., supra, these operations were distinguished from Slayter's method on the ground that "granulated cork is not an equivalent, because it is not fire resisting or substantially free from dust." 20 F. Supp. at page 379. The uncontradicted testimony in the present proceeding, however, is quite the contrary, namely, that granu-

lated cork is fire-resisting and not nearly as dusty as the Slayter material made in strict accordance with the patent specifications.

Furthermore, since 1914, the blowing, pneumatically, of various materials, including granulated cork, and packing such materials into confined spaces, has been fully disclosed, as evidenced by the prior art patents placed in evidence in the present proceeding. See particularly British patent No. 23,533 to Hugh Miller MacMillan, dated 1914. It was stated in the course of the present proceeding that this British patent, as well as numerous others presented herein, were not before Judge Woolsey in the New York case, among such others being the patent No. 1,478,865 to Carl Weber issued December 25, 1923, which comprised a method for injecting plastic materials into confined spaces by air pressure. See, also, Powers-Kennedy Contracting Corp. v. Concrete Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278.

From the aforegoing it is clear that if there is any claim to novelty in Slayter's idea, it must be restricted to his particular corn cob and plaster of Paris combination. Judge Woolsey held that this was new, and that it was for devising this material, and combining it successfully with old methods of installation to achieve a new and very useful result, that Slayter was entitled to patent protection. But the evidence produced in the present case makes untenable a finding that Slayter achieved a "new" result, or that it was "useful" in any appreciable degree, because, as we have seen, his material became, almost immediately, commercially unsuccessful, and it was only through the substitution of an entirely different material, mineral wool, that the combination became useful. It is, of course, true that a combination of elements, all of which are old, may, nevertheless, be patentable, if the result of such combination is, in fact, both new and useful. A fortiori, the same is true if one or more of the elements in combination are new. But, as has already been shown, the extremely limited commercial use to which Slayter's method was ever put, scarcely spells commercial utility or success. However, even if such be assumed, other patentees, long prior to Slayter, devised material for insulating purposes which may well be considered as equivalents. We agree that the American patent to Balduff, No. 1,-723,989, and the German patent to Orlovsky, No. 378,196, disclose doubtful equiva-

lents. However, two prior American patents, apparently not before Judge Woolsey, namely, to Clayton, No. 369,099, issued August 30, 1887, and to Brownell, No. 1,-737,957, issued December 3rd, 1929, on application filed November 2nd, 1926, that is, antecedent to the application date of Slayter's original patent, cannot be ignored. The composition covered by the first of these patents, designed to be used as a non-conductor of heat, consisted of comminuted cotton seed hulls, or waste or refuse of cotton seed oil mills, treated with a solution of alum or its equivalent, such as lime-water, in order to render them incombustible, and combined with plaster of Paris as a binder. The composition in the second patent consisted of mixing ashes of rice hulls and powdered gypsum with water to form a dry mix, the mixture being permitted to partially set, then it was agitated so that it was broken up, forming a loose and granulated mass, which was inserted in a damp condition into the building structure. Clearly, these compositions are vastly nearer to being equivalents of the Slayter material, than is rock wool, and we think are to be treated as such.

Turning to the next ground on which invalidity of the patent is asserted, namely, that the claim is broader than, and not responsive to, or supported by, the method prescribed in the specifications, we believe that this ground is also well taken. But one specific kind of material is described in the patent specifications for accomplishing the desired result, although there is added a catch-all phrase, already quoted, presumably in an effort to broaden the patent to cover every material, past, present and future, that might be found satisfactory to achieve the desired result; and the wording of the claim is likewise studiously made very comprehensive and elastic, namely, any material satisfies the claim that is "a finely divided but not powdered heat insulating and fire resisting material, said material being substantially free from dust and of low specific gravity and of a size to provide a large body for the amount of weight and substantially devoid of free moisture content * * *." In short, the claim is for a result without limitation to the means which the patent discloses for achieving that result. Such a claim is invalid. See Mackay Radio & Telegraph Co. v. Radio Corp., 306 U.S. 86, 618, 59 S.Ct. 427, 83 L.Ed. 506; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; Holland Furniture Co. v. Perkins Glue Co., 277

U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868; also Goldman v. Polan, 4 Cir., 93 F.2d 797. Furthermore, both the specifications and the claim require that the material be substantially free from dust, and free from moisture content. As a result of this court's insistence upon a considerable quantity of the Slayter material being mixed in open court, precisely according to the formula of the specifications, it became self-evident that when the compound was made with sufficient water to be free of dust, it was not substantially devoid of free moisture; and that when made with so little water as to be devoid of free moisture, it was many times dustier than granulated cork. Again, when the patentee himself mixed the materials in open court, it was found necessary, in order to lay the dust, for him to use three or four times as much water as the patent specifications named. In short, his material, so made, contained considerable free moisture content when ready for blowing, and it thus went counter to the specifications. Claims, to be valid, must be supported in every material particular by clear and definite description in the specifications. See Permutit Co. v. Graver Corp., 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163; Goldman v. Polan, supra.

■ What has just been said with respect to the claim and the specifications not being responsive, one to the other, supports the fourth ground asserted in support of the invalidity of the patent, namely, that the claim is vague and indefinite. Suffice it to say, in addition, that the reference in the claim to low specific gravity is open to the same objection. Slayter's material is described in the specifications as weighing not more than 20 pounds to the cubic foot. Granulated cork weighs approximately 5¾ pounds to the cubic foot, and glass wool, according to the patentee himself, may weigh as little as 2 pounds per cubic foot. Yet the wording of the claim is broad enough to, and Slayter would have it, include all of these other materials of such greatly divergent weights.

In an earlier part of this opinion, the phraseology of the claim of the original patent and of the reissue patent have been compared, and it has been pointed out that there was substantially little change in the language employed. Judge Evans, in Therm-O-Proof Insulation Co. v. Slayter & Co., supra, said, 7 Cir., 80 F.2d 557, 559, with respect to the original claim, that "greater indefiniteness and more vagueness could hardly be found." It is so worded (accidently or intentionally) as to catch an alleged infringer coming or going. But, fearful that the description be not sufficiently elastic, Slayter further says in his specifications: "While I have described one material and one method of applying it I do not wish to limit the method to the particular material mentioned, except as ultimately set forth in the claim." Judge Woolsey found that "The claim, as reissued, is not any longer subject to the principal criticism of vagueness made of it by the Circuit Court of Appeals of the Seventh Circuit, and it is not broader than the original claim, * * *." With this, we cannot agree.

In view of what has already been said, clearly demonstrating that the patent is invalid, the remaining ground asserted against its validity, namely, that there is no proof of "any inadvertence, accident or mistake" in the original patent, as required by the reissue statute, and hence no justification for the reissue patent in suit, need scarcely be considered as a separate question.

In the original patent there were eleven claims, the first seven were for a method, the remaining four, for a product. The Patent Office rejected all of these original claims and gave the following clear and succinct reasons for so doing:

"Claims 1 to 7 are rejected as not properly defining the alleged invention. The method claimed is not a 'method of heat insulating a building', but is in reality a part of the process of building a heat insulating wall. The material is in such cases forced into the air spaces in the walls of a building. The process, if properly defined, is not considered a patentable one, aside from the composition, as the only method of using such compositions in this connection is placing or 'forcing' it into the space in question.

"Claims 1 to 7 are rejected as unpatentable over Orlovsky or O'Hara, which indicates the use of a similar composition in the same manner.

"Claims 8 to 11 are rejected as unpatentable over Orlovsky. Orlovsky describes a mixture of any available organic fibrous material, with lime, gypsum (plaster of Paris) and a fungicide (potassium permanganate). In view of this art, no invention is seen in the substitution of any available fibrous materials such as corn cobs,

paper, etc., in place of Orlovsky sawdust, etc."

It is to be noted the Patent Office ruled that the process was "not considered a patentable one, aside from the composition, * * *." This gave Slayter hope. He revised his claims, and in connection therewith stated that his product to which he had given the name of Kalkite "has met with remarkable success as a heat insulation for buildings already built,"—a rather extravagant and inaccurate statement, to say the least, in view of the evidence presented to this Court. Nevertheless, he was successful, after submitting six revised claims, in getting the Patent Office to allow one of them, but there was no accompanying statement of the Patent Office's reasons or conclusions for so doing,—a practice which appears to be common with the Patent Office, but one which is regrettable, because when, as in the present case, the Patent Office's action is under review, the trial court is beset with considerable difficulty in determining, if indeed it can in such cases ever determine with any certainty, precisely what it was that controlled the Patent Office. Presumably, it concluded that Slayter had finally described in his claim a material that was new and had peculiar utility, in spite of the fact that it had stated that it saw no invention "in the substitution of any available fibrous materials such as corn cobs, paper, etc., in place of Orlovsky sawdust, etc."

Then came the decision of the Circuit Court of Appeals for the Seventh Circuit, in which, as we have seen, the allowed claim was declared invalid, because vague and indefinite in numerous respects, the Court stating (80 F.2d 559) that "There was not a sign of inventive genius in providing an opening in a wall, or in inserting in said opening the outlet end of a conduit (a nozzle), or in blowing or forcing material through a conduit", and adding that "The only novelty, which may be asserted for this claim is in forcing the specified materials * * *." Again, Slayter took heart from this last statement, and after making various amendments to his claim, finally described the material as being "finely divided but not powdered, heat insulating, fire resistant, free from dust and of low specific gravity, of a size to provide a large body for the amount of weight, substantially devoid of free moisture and as a result of the use of the material having these properties the wall is heat insulated and rendered fire re-

sistant without bulging or damage to the surface or to decorations thereon." These amendments were buttressed by affidavits of both Slayter and the manager of the home insulating division of Johns-Manville Company, to the effect that, because of the large content of powdered substance in so-called "Therm-O-Fill," the product of the Balduff patent, it had no utility for blowing purposes, but that on the contrary the Slayter material had great utility and represented a highly important development in the building art. These representations apparently were deemed sufficient by the Patent Office to allow the claim, but again, one must resort to speculation as to the precise factor that controlled the Patent Office in this, its second, decision, because just as in the first instance, no statement of reasons for conclusions is given.

To summarize, from all of the aforegoing, we are forced to the conclusion that the Slayter material can scarcely be said ever to have been commercially successful, and that even if we accord to it some small, temporary, commercial success, it nevertheless was anticipated completely in every phase of the combination, both as to elements and results, by the prior art. This being true, we see no ground for sustaining its validity even upon the most restricted terms.

Turning now to the separate assertion by the defendants that the present complaint should be dismissed because plaintiff has attempted to create an unlawful monopoly through its licensing methods, the following proven facts are pertinent to this inquiry, in addition to those already referred to, showing what Slayter did with respect to protecting and granting licenses under his patent. In the fall of 1930 plaintiff filed a bill in equity in the Federal Court for the Eastern District of Michigan against the Johns-Manville Company and another, for infringement of his original patent. About a year later, a decree was entered dismissing this bill without prejudice. Shortly prior thereto, plaintiff had entered into three substantally identical license agreements with the Johns-Manville Company, Eagle Picher Lead Company and General Insulating & Manufacturing Company, the Johns-Manville Company then being, as it still is, the largest, and these other companies being among the next largest manufacturers and sellers of rock wool in the United States. By each of these agreements plaintiff granted a license to the li-

censee, "its subsidiaries, agents and distributors, approved contractors and installers," and agreed not to grant any other license without the licensees' consent. These licenses and all subsequent ones to the same licensees were subject to cancellation by the respective licensees on ten days' notice, and they further provided that in the event of such cancellation, the licensee should be in the same position as to any defense against the Slayter patent as though the license agreement had never been entered into. In other words, the underlying intent of this form of license was obviously to license not so much the users of the alleged patented method, namely, the installers, but the manufacturers of the material used in the installation, with the right to such manufacturers to license others. The royalty stipulated to be paid plaintiff by each licensee was measured by the quantity of material installed by the licensee and its sub-licensees. In short, the obvious, necessary effect of such a method of licensing is to force installers to buy only from licensees who can sub-license use of pneumatic power, with the result that, were the plaintiff's patent to be upheld on the broad grounds for which plaintiff contends, there would be established, for a limited number of licensees, a monopoly in the manufacture and sale of unpatented mineral wool for use in insulating buildings.

Thus, as defendants contend, the licenses issued by plaintiff, and which were disclosed to Judge Woolsey and adopted by him as being evidence of the commercial success of Slayter's patent, cannot, on the evidence as presented in the present case, be so treated. They disclose an intent on the part of plaintiff and its licensees to establish for themselves an unjustified monopoly in the manufacture and sale of mineral wool for home insulation. The Johns-Manville Company and its customers installed rock wool by pneumatic power for three years without taking a license or paying tribute to Slayter, that is, for two years after the patent was granted to him, and for one year after suit was brought for its infringement. That company apparently took a license only when so doing afforded a chance for a monopoly in the manufacture and sale of unpatented mineral wool. While, from time to time, certain modifications have been made in the plaintiff's uniform license agreements just described, the primary features of all of them remained substantially the same.

The present intervener-defendant reluctantly accepted such a license in preference to patent litigation from January, 1934, until December, 1935, when the original Slayter patent was held void, as we have seen, in the suit in the Seventh Circuit.

In June, 1936, Therm-O-Proof Insulation Company (the defendant in that suit) instituted suit in the Northern District of Illinois against plaintiff, Johns-Manville Corporation and a subsidiary, Eagle-Picher Lead Company and a subsidiary, General Insulating and Manufacturing Company, and intervener (and Tennessee Products Corporation, then financially defunct), claiming treble damages, under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, for alleged conspiracy to restrain interstate trade and commerce in unpatented rock wool by creating and maintaining for plaintiff's licensees, through the operation of plaintiff's license agreements, a monopoly in the manufacture and sale of unpatented rock wool for use in insulating existing buildings. In November, 1937, plaintiff instituted suit in the same Court against Therm-O-Proof Insulation Company for infringement of the Slayter reissue patent. In October, 1938, the suit under the Clayton Act was settled by payment to Therm-O-Proof Insulation Company, by plaintiff, Johns-Manville Corporation, Eagle-Picher Lead Company, General Insulating and Manufacturing Company and intervener, of sums aggregating $20,000, of which intervener paid $3,200 and each of the others $4,200. At or about the same time plaintiff or one of its licensees granted to Therm-O-Proof Insulation Company a license under the Slayter reissue patent, and its patent case against that company was settled and a consent decree later entered.

Soon after issuance of the Slayter reissue patent on April 14, 1936, and before institution of the Clayton Act suit, plaintiff informed intervener that it did not wish to grant any licenses under the reissue patent until the reissue patent had been sustained in at least one court. In September, 1937, i. e., within a month after Judge Woolsey's opinion in Slayter & Co. v. United States Insulation Corp., supra, plaintiff requested intervener to execute a license agreement, in form similar to an alternative form set out in one of the license agreements executed by plaintiff with intervener under the original Slayter patent, with the omission

of plaintiff's agreement not to grant any other licenses without the consent of two-thirds of the existing licensees, and substitution of a provision that if more than five additional licenses should be in effect at any time, the royalties should be cut in half. Plaintiff informed intervener that this substitution had been made because of advice of counsel that the requirement of two-thirds consent might be seized upon by the plaintiff in the Clayton Act case as being a continuation of an alleged conspiracy between the licensor and the licensees. Intervener did not execute this license agreement as requested, but in or about September, 1937, license agreements in substantially that form were executed by plaintiff with Johns-Manville Corporation, Eagle-Picher Lead Company, General Insulating and Manufacturing Company and United States Gypsum Company. Immediately after settlement of the Clayton Act case above referred to, plaintiff requested intervener to execute such a license agreement, which intervener refused to do. Then, finally, in January, 1939, plaintiff instituted the suit referred to in the beginning of this opinion and now pending, against intervener in the Northern District of Illinois for alleged infringement of the Slayter reissue patent.

The circumstances under which the New York suit was dismissed are also germane to this phase of the present case. As already stated, an appeal was taken. This was done on instructions from manufacturers of rock wool, at whose expense the suit had been defended, and two of the manufacturers obtained leave to intervene. Thereupon, plaintiff and defendant settled the suit. Plaintiff waived an accounting, and the defendant took a sub-license from General Insulating & Manufacturing Company, one of plaintiff's licensees, whereby defendant agreed to buy its mineral wool from that licensee. In dismissing the appeal, the Circuit Court of Appeals said (2 Cir., 94 F.2d 41, 42): "Knowledge that the interveners were defending this suit was not made known to the appellee or the court. It is clear that a decree entered would not be res adjudicata against the interveners. * * * The interveners are in the position of one who has sold an old article of commerce to one who has thereafter treated it in such a way that it can be used in carrying out a patented process. They are in no closer relation to the litigation. Such interest is too remote to entitle them to carry on this litigation against the wishes of the appellant and appellee, who have settled. * * *

"Because they did not apply to intervene and control the suit promptly and give notice to appellee or the court as to their interest, they may not continue this appeal against appellant's objection. * * * *"

■ What plaintiff has been doing by its licensing methods, as above described, was contrary to law because, when fully disclosed, it is clear that they have resulted in the use of a patent to create or maintain a monopoly in the manufacture and sale of unpatented material used in applying a patented invention. In other words, it was tantamount to an extension of the patentee's monopoly beyond the lawful limits of the patent. Such conduct a court of equity should not aid or approve. Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S. Ct. 288, 82 L.Ed. 371; International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, certiorari denied November 13th, 1939, 60 S.Ct. 175, 84 L.Ed. ——. Defendants, in the present proceeding, are asking, by way of counterclaim, for an injunction against, and damages for maintaining, this unlawful system of licenses. In this counterclaim they allege that the plaintiff's methods have resulted in the defendants each losing valuable business and, further, that their customers have been solicited not to deal with the Philip Carey Manufacturing Company or with the Standard Lime and Stone Company, intervener-defendant, or with the users of mineral wool manufactured by these companies. On the other hand, as plaintiff points out, except in so far as the licenses themselves may be said to sustain the defendant's position, defendants have produced no proof of these latter allegations. Plaintiff further points out that it now licenses not only manufacturers who install mineral wool under the Slayter patent, but, also, some who manufacture mineral wool but do not install it, and some installers who do no manufacturing of mineral wool, but who buy that which they do install upon the open market.

■ Since defendants have proved no actual loss of business or other actual damage,—except litigation expense, due doubtless, largely to the fact that inter-

vener-defendant has been under obligation to protect its customers in the event of patent litigation,—there is no ground for allowing an accounting for damages under the counter-claim. However, the defendants are entitled, in addition to dismissal of the bill of complaint, to (1) a declaratory judgment that plaintiff's patent is invalid and not infringed, United States Galvanizing & Plating Equipment Corp. v. Hanson-Van Winkle-Munning Co., 4 Cir., 104 F.2d 856; and (2) an injunction against the plaintiff bringing infringement suits against any of their customers in this or any other district. Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065; United States Galvanizing & Plating Equipment Corp. v. Hanson-Van Winkle-Munning Co., supra; see also, General Chemical Co. v. Standard Wholesale Phosphate & Acid Works, 4 Cir., 101 F.2d 178. For we agree with the argument, made on behalf of defendants, that "The very system of (1) the plaintiff's licenses and (2) its methods of litigation is a standing threat and is so intended."

Judgment will be entered in accordance with this opinion.