Donald E. MARSHALL, Plaintiff,

v.

The PROCTER & GAMBLE MANUFACTURING COMPANY

and

The Procter & Gamble Distributing Company, Defendants.

Civ. A. No. 9207.

United States District Court
D. Maryland.

Nov. 8, 1962.

John D. Alexander, Constable, Alexander & Daneker, Baltimore, Md., Ira Milton Jones and James R. Custin, Mil-

waukee, Wis., George B. White and Alfons Puishes, White & Puishes, San Francisco, Cal., for plaintiff.

William A. Grimes, Ober, Williams, Grimes & Stinson, Baltimore, Md., Dugald S. McDougall and Theodore R. Scott, Chicago, Ill., G. T. Delahunty and Gibson Yungblut, Cincinnati, Ohio, of counsel, for defendants.

R. DORSEY WATKINS, District Judge.

Donald E. Marshall (Marshall or plaintiff) filed a three count complaint against The Procter & Gamble Manufacturing Company and The Procter & Gamble Distributing Company (Procter & Gamble or defendants). Defendants answered and counterclaimed for declarations the converse of plaintiff's claims. During the course of the trial, the counterclaims were abandoned.

The third cause of action was for alleged "False Marking and Misrepresentation in violation of Title 15 U.S.C. § 1125(a) (Lanham Act). Defendants moved that the third cause of action be dismissed for failure to state a claim against defendants upon which relief could be granted. After briefing and argument, the motion to dismiss was granted without prejudice. An amended third count was filed, on which a hearing was had. As a result of the comments of the court, although without formal ruling, plaintiff filed a second amended third count. Following further briefing and argument, the second amended third count was dismissed without leave further to amend, for the reasons stated in Marshall v. The Procter & Gamble Manufacturing Company, et al., D.Md.1959, 170 F.Supp. 828.

The second cause of action was for breach of an alleged confidential relationship. This count was submitted to the jury on interrogatories as to whether or not, during the critical period, plaintiff disclosed to defendants anything defendants did not already know with regard to the processing of certain soap bars; if so, was this disclosed in confidence; if so, was such information used by defendants; and in any event, did the plaintiff have the right to maintain an action on his own behalf with respect to such disclosure and use.[1] The jury answered the first interrogatory in the negative, making it unnecessary to consider the other three; and the court directed the Clerk to enter judgment for the defendants on the second cause of action.

The first cause of action[2] was for alleged infringement of United States

---

[1]. The right of plaintiff to maintain on his own behalf the second cause of action is dependent primarily upon the construction of a settlement agreement dated May 8, 1956, which is the only written document under which plaintiff claims. It does not in terms purport to convey such a right. In view of the action of the jury with respect to the second cause of action, it is unnecessary further to explore interesting avenues such as whether the transfer of a patent carries rights to trade secrets and to sue for violation thereof occurring before the issuance of a patent; whether the issuance of a patent supersedes any rights to sue for violation of trade secrets connected therewith, even if the patent later be held to be invalid; and whether the parties to a written contract may offer parole testimony as to their intent, in an action by one of them against a third party, based on such contract.

[2]. Prior to the trial, plaintiff's counsel insisted upon a jury trial upon the first cause of action—validity and infringement—as well as the second cause—breach of confidential relationship. The court was then unable to persuade them of the undesirability of this procedure, and, so far as the court is advised, this trial began as the first patent case ever tried to a jury in the District of Maryland.

After the conclusion of the plaintiff's case, defendants filed a motion to dismiss counts one and two. In the argument thereon, the court expressed rather grave doubt as to the validity of the patent. Counsel for plaintiff thereafter, with the consent of counsel for defendants, withdrew the prayer for a jury trial on the first count, submitting the question of validity and infringement to the court for decision. The jury was advised that it would be concerned only with the second cause of action.

Patent 2,724,702, issued [3] on November 2, 1955 on Application No. 447,411, filed August 2, 1954, and claimed to be a continuation-in-part of Application No. 271,060 filed February 11, 1952 and now abandoned. Defendants filed the usual defenses of lack of invention; prior public use; lack of novelty in view of the prior art; and indefiniteness of the claims and disclosures.

---

The patent in suit is for "Method of Improving and Simplifying the Cold Milling of Soap and Products Obtained Thereby."

Soap is essentially the product of the neutralization of fatty acids (e. g., tallow, grease, certain plant and marine oils) with a caustic solution, usually of potash or soda. The first domestic production appears to have been through the use of tallow and wood ashes to produce a soft potash soap, which was hardened by treating with salt.

In the commercial production of soap, one of the chief problems was the removal of glycerin resulting from the neutralization process. In the "kettle" process, which as its name implies involves heating the fatty acids together with caustics in a large container or kettle for perhaps a week, a separation occurs and the upper, or soap, layer is drawn off. In defendants' production of kettle soap, sodium hydroxide was used as the neutralizer; and defendants have never been able to obtain satisfactory results with a mixture of sodium hydroxide (hereafter sodium or soda) and the more expensive potassium hydroxide (hereafter potassium or potash) in the kettle.

More recently a hydrolizer process has been developed, under which the fatty acids are "split" with water, which removes the glycerin. The resulting fatty acid can then be neutralized with straight sodium hydroxide, straight potassium hydroxide or any mixture of the two.

If the soap produced by either method is heated, or maintained at a temperature sufficient to cause it to flow readily, it may be pumped into a steel frame (either directly, or after having been mixed with builders, fillers or other nonvolatile additives) where it is allowed to cool gradually (perhaps a week) and then cut into slabs and bars.

This "frame" soap has certain characteristics, some desirable, others undesirable from the standpoint of commercial use. Its crystalline structure, relatively uninfluenced by pressure, gives a homogeneous bar, the surface of which reacts uniformly to water. It is therefore not subject to the development of "wet cracks" on exposure to water and drying. Also, it does not tend to develop a thick, gummy layer when left in water. However, it is brittle and can be broken or chipped; it has a moisture content of about thirty per cent; and because of the heat to which it is subjected, it is not practicable to add expensive perfumes or other volatile material.

The raw soap, instead of being poured into frames, may be dried and solidified, and then mechanically worked or milled,

The court cannot help but comment upon the undesirability of a jury trial in patent cases. To expect the court to be able, immediately upon the completion of a twenty day case, to instruct the jury intelligently and intelligibly upon questions of validity and infringement; the prima facie effect of the issuance of the patent; the prior art and its significance; questions of novelty, etc., is highly complimentary but alarmingly disingenuous. To expect a jury to be able to decide these questions off-hand is tacitly an expression of belief in modern miracles.

This is not intended as personal criticism of counsel for plaintiff, who conducted themselves in accordance with the best traditions of advocacy. It is wrung from the court's own experience—and that of other judges with whom the matter was discussed—that patent cases should be decided only after briefing, argument, and a careful resurvey of the transcript (here 2812 pages), and the exhibits.

3. To Marshall, assignor of Micro Processing Equipment Co., Inc., and by it reassigned to plaintiff by proper assignment of record in the Patent Office.

by passages between rollers and by extrusion under pressure from screw-like propellants, or by other means by which the soap may be subjected to pressure and internal and external shearing action. As these milling operations may be conducted at room temperature or higher or lower, and as in practice the temperature does not exceed 100°F, there may be added to the soap in its initial stages volatile perfumes, and emollients. The moisture content of the finished product milled soap is usually 12–14%.

(A description of the then existing distinction between milled and frame soaps is to be found in Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 1943, 139 F.2d 633, a case carefully considered by the court, but not otherwise found to be in point).

The soap ordinarily leaves the milling process in cylindrical form, and is cut into blanks roughly the length of the soap bar die. These blanks are then pressed into bar form, with whatever ornamentation or identification may be desired.

Because of the compacting which occurs in milling and extrusion, but which is not completely uniform, the hard, firmly compacted bar, especially if a soda soap, is subject to wet cracking when exposed to water, and dried. It was well known in the trade that wet cracking could be reduced, if not completely eliminated, by the addition of potash in amounts comparatively small as contrasted with the amount of soda soap. The addition of potash, however, had the effect of softening the bar of milled soap. A hardening effect could be introduced in various ways, as by milling the soap at a lower temperature; or by the use of base fats of a lower iodine value.

The defendants are large manufacturers of frame and milled soaps including the accused Camay milled soap. The plaintiff is a former employee of defendants, having held responsible positions with them over a period of seventeen years. He had also held responsible po-sitions for five years with another large soap manufacturer. From 1945 to 1950, he had independently worked on soap making apparatus and soap products in his home laboratory. He then obtained financial backing, and began the development of soap-making machines on which he obtained patents, but none of which has been used on a commercial basis. It was in the course of this machine development work that he claims to have discovered, in December 1951, the invention here in suit.

For an understanding of the claimed invention rather substantial quotations from the specifications will be necessary, as well as the quotation of the full text of Claims 1, 2 and 3, the only claims in suit.

## SPECIFICATION

"This invention relates to the art of refining soap preparatory to formation thereof into bars and cakes, and has as its purpose to provide a better bar of soap.

"The invention is predicated upon the discovery that a greatly improved bar of toilet soap with an unprecedented highly desirable waxy texture is obtained if the base material from which it is formed or pressed consists essentially of a mixture of fatty-acid potash soap and fatty-acid soda soap in proportions of between 5% and 30% potash soap, and between 95% and 70% soda soap, which mixture has been subjected in the solid state and at a temperature below the crystalline reversion point of the soap, to a mechanically produced internal shearing action great enough to convert the mixture to an ultramicrocrystalline state.

This state is evidenced by:

 a rubbery translucent waxy texture,

 good cold welding properties,

 a substantially non-swelling gel structure,

 freedom from objectionable soap dish jelly formation,

■ high viscosity, and

■ excellent solubility and lathering action.

These are the qualities which have always been sought in fine toilet soaps but heretofore could not be attained except by the ultramilling technique taught in the Marshall Patent No. 2,619,680, and the Marshall et al. Patent No. Re. 23,760. Cold roller milling, which had long been the conventional way of mechanically refining the crystalline structure of toilet soap prior to the invention of the ultramilling methods covered in Patents Nos. 2,619,-680 and Re. 23,760, was incapable of achieving the internal shearing action needed to attain an ultramicrocrystalline state.

"The ultramilling technique disclosed in the afore-said patent [sic] enabled ordinary fatty-acid soda soap to be reduced to an ultramicrocrystalline state, but required the application of high speed shearing forces upon very thin films of high viscosity soap. The present invention not only yields a product which has the desired ultramicrocrystalline state without entailing ultramilling in the manner taught in these patents, but in addition, greatly expands the range of soap formulations and still obtains a satisfactory bar, because the invention achieves a soap having an unexpectedly high viscosity or firmness over a wide range of fat titers and moisture percentages. This increase in firmness or viscosity is quite contrary to the softening effect normally experienced when fatty-acid potash soap is admixed with soda fat acids.

"Moreover, a toilet soap made in accordance with this invention and containing 20% fatty-acid potash soap and 80% fatty-acid soda soap,

and 12% to 14% moisture has a substantially higher viscosity, i. e., is much firmer than if the same fats were saponified with sodium alone, other conditions being equal.

"It is not known just why a mixture of potash soap with soda soap milled in the solid state at a temperature below the reversion point of the soap brings about all the desirable qualities that have been attained. It is possible that the potash soap when thus milled with the soda soap somehow softens the crystals of the soda soap so that they are more easily subdivided, notwithstanding the fact that less speed and less pressure is employed in the milling operation than is required for the ultramilling of soda soap alone. On the other hand the remarkably high viscosity of the product, despite the presence of a considerable amount of potash soap, suggests that the step of milling the two soaps together in the solid state not only converts this soap mixture to an ultramicrocrystalline state but also brings the resulting sub-micron sized hard crystal particles closer together and perhaps even effects an interlocking engagement between them." [4]

\* \* \* \* \* \*

"The synthetic detergents contemplated in this invention are only the solid organic non-soap type, that is, such synthetic detergents as will form a solid particle capable of being attached to a particle of ultramicrocrystalline cold milled fatty-acid soap." [5]

\* \* \* \* \* \*

"Experience indicated that neither the manner in which the mixture was effected, nor the state of the soap (liquid or dry) at the time of mixture, had any bearing upon the results. The important factor was

4. Column 1, line 15—Column 2, line 12. The "evidences" of the "ultramicrocrystalline state" have been paragraphed

and numbered by the court, for easy reference.

5. Column 3, lines 50–54.

that the mixture had to be in the solidified state at the time it was reduced to an ultramicrocrystalline state by milling. 'Solidified state' is understood to mean that the mixture had a moisture content no greater than 18% and was at a temperature less than 120°F. The lower limits of moisture and temperature depend only upon the capabilities of the apparatus. Thus, while the examples given show no moisture content less than 5%, the apparatus of Patents Nos. 2,619,680 and Re. 23,760 (especially the latter) is capable of handling soap mixtures of less moisture content; and in one instance, in order to more effectively demonstrate the exceptional solubility of the product, the moisture content was reduced to 2%.

"It should also be noted that since the conversion to ultramicrocrystalline state is done at a temperature below the crystalline reversion point (120°F.) the product is stable against crystal enlargement and/or crystal separation or reorientation which, if it occurred, would destroy the properties sought." [6]

\* \* \* \* \* \*

## CLAIMS

"What is claimed as my invention is:

"1. In the process of milling solidified fatty acid soda soap to an ultramicrocrystalline state by subjecting said soap, at a temperature below its crystalline reversion point, to a mechanically produced shearing action, the characterizing step of introducing a milling promotion agent to the soda soap to be milled so that the transformation of the structure of the soda soap to the ultramicrocrystalline state is facilitated to such an extent that conventional soap extruders can be employed for such transformation, said milling promotion agent being a fatty acid potash soap which is mixed with the soda soap in proportions such that the potash soap constitutes from 5 per cent to 30 per cent by weight of the mixture, considered on an anhydrous basis.

"2. In the process of milling a solidified soap base material which has fatty acid soda soap as its principal component, to an ultramicrocrystalline state, and which process involves subjecting said soap base material, at a temperature below the crystalline reversion point of the soda soap, to a mechanically produced shearing action, the characterizing step of incorporating in the base material to be milled a milling promotion agent by which the transformation of the structure of the soda soap component to the ultramicrocrystalline state is facilitated to such an extent that conventional soap extruders can be employed to effect such transformation, said milling promotion agent being a fatty acid potash soap which is mixed with the base material in proportions such that the potash soap constitutes from 5 per cent to 30 per cent by weight of the soda-potash soap combination, considered on an anhydrous basis.

"3. A cake of milled toilet soap characterized by the fact that the soap base material from which the cake is formed consists essentially of a homogeneous and thoroughly coalesced milled mixture of fatty acid potash soap and fatty acid soda soap in the ultramicrocrystalline state which results from subjecting the mixture of potash and soda soap while in the solidified state, and at a temperature below the crystalline reversion point of the soaps to a mechanically produced shearing action, and which state is evidenced by a rubbery translucent waxy texture, good cold welding properties, a substantially non-swelling gel structure, freedom from objectionable soap dish jelly formation, high viscosity

6. Column 7, line 61—Column 8, line 8.

and excellent solubility and lathering action; the percentage of fatty acid potash soap in said milled mixture being 5 per cent to 30 per cent thereof, and the balance being fatty acid soda soap, considering the mixture in the anhydrous state."

On the question of validity, defendants primarily contend that the patent is invalid because of the indefiniteness of the disclosures, which would not teach the practice of the invention to one skilled in the art, and indefiniteness of the claims in suit (35 U.S.C. § 112); and because even if there are adequate disclosures, they relate to matters old in the art and largely to processes already practiced by the defendants. To these, the court has added a consideration of certain representations contained in the patent itself, the validity of which representations has been destroyed by the records and testimony of the plaintiff.[7]

## VALIDITY

I. Indefiniteness of the specification.

1. Cold milling.

The title refers to a method of "improving and simplifying the cold milling of soap * * *"

The specification refers several times (Column 1, line 28; Column 2, line 15) to cold milling. No definition of "cold milling" appears in the patent, or in the file wrapper. Plaintiff testified that cold milling occurred in the range of 90°–110° F.[8] Marshall's Director of Chemical Engineering, in charge of all development and research work, testified that there were as many cold milling temperatures as there were soap companies, but that he used 70°–80°. Ferguson, defendants' expert, and the only other witness interrogated on this subject, testified that he was not familiar with the term "cold milling" in the soap industry, but that milling temperatures generally were between room temperature and 115°–120°.

This failure to define what is cold milling, the intended meaning of which would not be plain to one skilled in the art, has further relevance in the discussion of anticipation and novelty.

2. A mechanically produced internal shearing action "great enough" to convert the mixture.

Nowhere in the patent, or in the testimony, is there a disclosure of how much, or how little, is "great enough." What the patent teaches in this respect is, alternatively, and inconsistently, that while the best results can be obtained by the use of plaintiff's patented machines (Column 2, lines 23, 25), the invention makes it possible to produce the patented soap by milling "at shearing speeds and practices far below those needed in the practice of ultramilling techniques of" the machine patents (Column 2, lines 19–22).

Nowhere, in the patent or in the testimony, is there a disclosure of what the above language means in terms of soap production on defendants' machinery, or in any soap factory.

3. A mixture converted to "an ultramicrocrystalline state."

From a study of the patent, the court thought that this meant a soap at least a majority of the crystals of which were of a size below the wave length of light. This, however, would have permitted an objective determination of the character of plaintiff's soap and of the accused soap. It was (therefore?) too simple a solution to suit the plaintiff. His testimony was that "ultramicrocrystalline state" was a phrase coined by him to characterize his "discovery" on December 11, 1951; that he did not know what it really was, and so he used it to describe

7. The patent in question was originally assigned to Micro Processing Equipment Co., Inc. However, the plaintiff Marshall was the chief executive officer of that company with full authority to represent it in all matters pertinent hereto, and the patent was subsequently reassigned to him. The court, therefore, has referred to Mr. Marshall throughout as if he were, in all instances, the principal.

8. Farenheit is used in all references to specific temperatures, unless the contrary is stated.

a soap having the characteristics of his invention or discovery. He pointed out the two alternative possible explanations he had given in the patent; that potash milled with soda soap softened the crystals of the soda soap so that they were more easily subdivided; or that milling the two soaps together not only converted "this soap mixture to an ultramicrocrystalline state but also brings the resulting sub-micron sized hard crystals closer together and even effects an interlocking engagement between them."

While the reference in the claims is primarily to soap in an ultramicrocrystalline state, and therefore seems to adopt the latter explanation, with its sub-micron sized crystals, plaintiff was insistent that his soap was not an ultramicrocrystalline soap, but a soap in the ultramicrocrystalline state; and that there was a difference—in *this* patent—between an ultramicrocrystalline soap, and soap in the ultramicrocrystalline state. Again, there was a further premium in vagueness. Other soaps such as Pears soap and Gayla soap are true ultramicrocrystalline soaps—soaps in which all or substantially all the soap crystals are of sub-micron size—and it would not do to permit an objective comparison between these, and plaintiff's and defendants' soaps.

But even so, the sledding was not easy for plaintiff. He was reminded of the fact that the patent in suit referred to his United States Patent No. 2,619,680, issued December 2, 1952 on application filed November 29, 1949, and that in depositions in the present case, when asked to describe what he meant by the ultramicrocrystalline phase of soap, he himself referred to that patent for the best definition. The 2,619,680 patent contains several references to ultramicrocrystalline, which is identified as *soap* in which the particles are smaller in size than six tenths of a micron. Plaintiff attempted to explain, however, that the 2,619,680 patent related to ultramicrocrystalline soap, while the patent in suit related to soap in the ultramicrocrystalline phase; that he had coined the phrase "ultramicrocrystalline phase" in February, 1952, to describe the texture of his soap, and used it in his patent application filed February 11, 1952. However, in the specification in that application, he three times refers to his process as relating to, and the product as being, ultramicrocrystalline soap, as against two references to soap in the ultramicrocrystalline state. Further, when shown a paper prepared by him on June 22, 1949, referring to work he was doing on soap bars, in which the "ideal state" was called the "ultramicrocrystalline state" he admitted that he "had coined it that early." He was then shown a letter to defendants in which he claimed that since 1945 he had advocated the advantages of soap milled to the ultramicrocrystalline state; and was finally forced to admit that he "must have coined it that early."

Even in the patent in suit, there seems to be an explicit, and there certainly is at least an implicit, recognition that the process of Marshall's patent is for the production of, and the soap produced is, at least in part, an ultramicrocrystalline soap. Column 3, lines 50–54, states that the "synthetic detergents contemplated in this invention are only * * * such synthetic detergents as will form a solid particle capable of being attached to *a particle of ultramicrocrystalline cold milled fatty-acid soap.*" (Emphasis supplied). There could be no possible reason or excuse for a reference in the specification to a detergent capable of being attached to a particle of ultramicrocrystalline cold milled fatty-acid *soap* unless in the exercise of the process of the patent there was some ultramicrocrystalline cold milled fatty-acid soap to which such detergent could attach. Therefore, within the meaning of the patent, a soap in an ultramicrocrystalline state must either be, or must contain some, ultramicrocrystalline soap.

Furthermore, the patent refers specifically to the "reversion point of the *soap*" (Specification, Column 1, line 68), and to the "crystalline reversion point of the *soaps*" (Claim 3, Column 8, line 66; emphasis supplied).

■ The court recognizes the right of an inventor to be his own lexicographer, and to give to an ordinary, or extraordinary, word, a meaning entirely different from its normal meaning—provided that this equating is explained in the patent itself. In the patent in suit, although the claims relate to soap in the ultramicrocrystalline state, no definition of that term is given. Instead, the patent relies upon six attributes that are said to evidence this state.

4. "Evidenced by":

a. A rubbery translucent waxy texture.

Just what was meant by "rubbery" and "waxy" was not clear to the court either from a perusal of the patent, or after the conclusion of the testimony. To the extent that these attributes were sought to be explained by a demonstration with a thin slice cut from plaintiff's soap, they were likewise met by subsequent demonstrations on competitive soaps, some of which were admittedly not ultramicrocrystalline or in an ultramicrocrystalline state.

b. Good cold welding properties.

Plaintiff's soap never met the cold welding (anti-wet crack) performance of Lux, or of Swan—the latter soap being the raw material from which plaintiff's best bars (No. 232) were made.

Moreover, "good" is purely a subjective standard, which would seem to the court to mean only that which would be sufficient to satisfy the particular potential market. One manufacturer might be willing to sell a cheap (or "inexpensive" or "economy") soap; another would seek to satisfy a more discriminating, sophisticated or gullible trade—at a much higher price. What might be "good" in either classification might be materially different when objectively compared; just as a "good" shortstop in Class D, Class AAA, and the major baseball leagues would be judged by a materially different performance standard.

c. A substantially non-swelling gel structure.

Here again, the test is subjective; or represents an undisclosed basis of comparison. In the tests that were made, both by plaintiff and defendants on actual soap bars, there was no bar that did not have a clearly observable, and in that sense "substantial," swell after immersion. Indeed, if there were not some swell, it is improbable that there would be any solubility, in which event the soap would be useless as a cleansing agent. Here, again, the plaintiff's soap and all the Camay bars had a noticeably greater swell than the competitive Lux bars.

d. Freedom from objectionable soap dish jelly formation.

This represents probably the acme of subjectivity. Objectionable to whom—the plaintiff as to his own soap; the plaintiff as to all other soaps; the defendant as to its soaps; the chemist; the public? It is no answer to say, as did plaintiff's counsel, that as there was *no* soap dish jelly formation with respect to plaintiff's soap on immersion, it could not be objectionable. There was some, although slight, formation with respect to plaintiff's soaps. If plaintiff meant "no soap dish jelly formation," he could easily have said so—even if factually incorrectly.

e. High viscosity (firmness).

Here again, we are entirely in the subjective field.

As hereinafter noted, plaintiff apparently considers anything between 100 and 600 (Harrington) a high viscosity, although as of Febuary 8, 1952 he had never succeeded in producing a satisfactory soap bar at a viscosity below 400. The language was apparently designed to permit plaintiff to claim, as he did, that any competitive bar that sold commercially had a "high viscosity."

f. Excellent solubility and lathering action.

Whether "excellent" should mean the best, or merely that it excels or exceeds something (not described) with which it·is sought to be compared, neither definition is apt in a comparison with de-

fendants' pre-invention Camay; for plaintiff's soap had no better solubility and lathering action than such Camay.

The Procrustean bed attributes of these "evidences" is demonstrated in their attempted application by plaintiff in several instances. The defendants measure "wet cracks" in, and lathering properties of, soaps on a scale of 0 to 10, ten being perfect. Plaintiff testified that before his discovery the wet cracking in Camay was about 8, and poor; the lathering properties of his soap, and of Camay before his discovery, were 6–7, which would fall within the "excellent" range. He also referred to several of the Camay bars of which the swelling was much greater than that of plaintiff's bars, as infringing, and therefore as necessarily "substantially non-swelling."

Moreover, plaintiff admitted that some of these "evidences" could be found in soaps not in the ultramicrocrystalline state; and that in different soaps in the ultramicrocrystalline state certain of these "evidences" would be better, and others worse. Finally, plaintiff stated that even if all of these evidences were present in a particular bar, it would be impossible to determine whether or not such soap was in the ultramicrocrystalline state unless the inquirer also knew that it contained potash, and was "cold milled." [9]

■ The court recognizes that except where criticality is the essence of an invention, latitude in the expression of standards is permissible; but there should be some ascertainable standard.

Here, instead of the vague "good", "substantially", "freedom from objectionable", "high", "excellent"—the meaning of which is completely dependent upon how "high" or "low" the reader, or manufacturer, or consumer "sets his sights",[10] it would have been easy to state a basis upon which true comparisons could have been made. The patentee could have related these "evidences" to the attributes or characteristics of existing soaps— "cold welding properties as good as (or better than) those of any presently milled soap," or of a specific soap or soaps— Camay, Lux, etc.; or the same absence of wet cracking "as that found in frame soaps."

As to solubility and lathering, the patent itself refers to a patented method by which lathering properties can be "accurately determined" (Column 4, line 70). Plaintiff was also familiar with the "rubs to suds" test.[11] Certainly a definite standard could have been stated, instead of the "excellent—lathering action."

Perhaps the clearest example of apparently intentional vagueness is demonstrated by the reference to "high viscosity." This could have been expressed in terms of seconds or counterpoises; or it could have been in terms used in the soap trade—so many, or not less than a certain number of, "Mullen" [12] units. Or it could have been expressed in readings on the Harrington viscosity engine, described in the patent in suit. This failure is especially significant.

(a) The patent gives eleven purported examples of "specific embodiments of the

9. Just a few minutes before this statement, Marshall had testified that if a bar of soap had the six attributes in question, it could be said that it was in the ultramicrocrystalline state without any knowledge as to how the bar had been made.

10. "How deep is the ocean; how high is the sky?"
"Bali high, Bali low."

11. Plaintiff had worked for the defendant, The Procter & Gamble Manufacturing Company for seventeen years between

1920 and 1937, during which period he had held responsible positions; and later had worked for five years with Colgate-Palmolive. He was, accordingly, thoroughly familiar with the "rubs to suds" method for testing solubility and lathering action.

12. The defendants use, and for many years have used, the "Mullen" test, adapted from the paper industry, to determine and measure the firmness of soap bars. Marshall was fully familiar with this method of testing.

invention"[13] each of which must therefore have been of a soap of "high viscosity." The respective viscosity readings (Harrington) were 150, 300, 400, 100, 600, 200, 100, 100, 100, 100, 200. If 100, 150, 200, 300 and 600 is each "high", how low or high is "high"?

(b) (i) In the prosecution of what plaintiff calls the patent application for the patent in suit, a number of claims referred to the production of soap with a moisture content below a certain stated per cent. These were amended to refer to a "viscosity substantially greater than that of an 80 per cent tallow, 20 per cent coconut oil roller milled soap of 12 per cent moisture * * *"

(ii) Original claim 8 of the first application referred to "high viscosity properties." This was amended to "viscosity substantially greater than that of an 80 per cent tallow, 20 per cent coconut oil roller milled soda soap of 12 per cent moisture. * * *"

(iii) In two instances, the claims in the first application referred to "homogenizing mixture * * * at a viscosity higher than 400 as measured on the Harrington viscosity meter."

5. The "crystalline reversion point."

The crystalline reversion point is stated in the patent to be 120°. This is the temperature below "the reversion point of the soap" (Column 1, line 68) or below which the conversion to the ultramicrocrystalline state must be effected, to make the product stable against crystal enlargement and/or crystal separation, or reorientation, which, if it occurred, would destroy the properties sought.

According to this teaching, the soap-making operation[14] must be conducted below 120°, but presumably anywhere below 120°. Correspondingly, it may not be done at 120°, or above. To the plaintiff this 120° is really an accordian-like description, to be expanded or contracted as the occasion may require; or a spring board from which to take off.

(a) The 120° figure was not one reached by experimentation at immediately above and below that figure, but was simply a matter of the plaintiff's "judgment."

(b) The attention of the plaintiff was called to the fact that 120° was above the top "cold milling" temperature as defined by him, and that there therefore appeared to be an hiatus of 10°, in that under the teachings of the patent soap could be milled between 110° and 120°, which would be below the crystalline reversion point, but above "cold milling." His immediate response to this was that "110 equals 120."

(c) In commenting upon Example D in the patent, plaintiff stated that the crystalline reversion point in that Example would be 80°.

(d) A 1954 Camay bar used in one of plaintiff's visual demonstrations and claimed to possess the qualities of plaintiff's soap had, according to the plaintiff's testimony a crystalline reversion point between 78° and 82°.

(e) Most of the runs used for Example A in the patent, were at 120°, one being at 165°—all above plaintiff's definition of the cold milling top, and above the crystalline reversion point.

It is therefore clear that one relying on the patent and assuming that any temperature below 120° was a safe temperature, would be badly misled. The 120° crystalline reversion point, instead of being a control point, would be a snare and a delusion.

———

Plaintiff, or his patent attorney, knew how to express "evidences", or attributes, specifically. The failure to do so in the patent as issued seems deliberate. It appears to have been designed to permit

13. As will later be explained, these "examples" were *not* "specific embodiments" of the alleged invention.

14. According to the testimony of Marshall, the last milling temperature, and not the extrusion temperature, was decisive on conversion to the ultramicrocrystalline state. Extrusion processes and procedures had no effect in this respect.

plaintiff to apply his own definitions to these "evidences," and as so defined, elastically if necessary, to claim infringement.

■ The patent is therefore invalid for failure adequately to disclose the alleged invention. The citation of authorities is postponed until after a discussion of the claims.

II. Indefiniteness of the Claims.

Section 112 of Title 35 U.S.Code, provides in part that:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which applicant regards as his invention."

It should, first, be noted that none of Claims 1, 2 and 3 is limited to, or refers to, "cold milling."

■ More importantly, all the claims relate to an ultramicrocrystalline state which has not been defined in the specifications. The claims will, therefore, necessarily fail, unless there is written into them the language of the specification that such state is "evidenced by" the six attributes previously discussed. Assuming, without deciding, that this could be done as to claims 1 and 2, the claims would still fail. Reading into the claims the indefinite language of a specification cannot make the claims definite.

Further, it is to be noted that Claims 1 and 2, the process claims, refer to the introduction of a milling promotion agent, so that the transformation of the structure of the soda soap to the utramicrocrystalline state is facilitated to such an extent that "conventional soap extruders can be employed *for such transformation * * *"*. (Emphasis supplied). Plaintiff was quite positive in his testimony that the transformation into the ultramicrocrystalline state was effected either exclusively or practically exclusively by the milling operation or the last milling operation, if more than one, and that the extrusion aspect had no effect upon the production of the ultramicrocrystalline state.

This is not a case in which a sympathetic effort should be made to correct a mere inadvertence or oversight. Claim 8 of the original application referred to a soap cake having "rubbery, translucent texture and cold-welding, high solubility, and high viscosity properties * * *".

Claim 9 of that application related to "a soap cake having a rubbery, translucent texture and cold-welding and high solubility properties * * *."

The plaintiff had, accordingly, demonstrated a knowledge of the necessity for at least attempting to incorporate into the claims explanatory language where an otherwise undefined term was used. They would nevertheless have been as indeterminate, ambiguous and indefinite as the language of the specification, hereinbefore considered.

The claims are invalid for indefiniteness.

The United States Supreme Court has condemned the use of "indeterminate adjectives" in claims, and of "conveniently functional language at the exact point of novelty". General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 371, 58 S.Ct. 899, 82 L.Ed. 1402. In that case the typical claim, held to be invalid on its face, contained a description embodying "substantially", "mainly", "comparatively large", "substantial", and "normal" or "useful life."

Claim 3 of the patent in suit refers to soap in the ultramicrocrystalline state "evidenced by" the six characteristics which are recited. Claims 1 and 2 refer only to the ultramicrocrystalline state. Even if these asserted properties can be incorporated from the specification by inference or reference, their indeterminate nature, heretofore discussed, remains just as indeterminate.

In United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232, the court, in construing the specifications, accepted the testimony of the patentees, and held that where, on such testimony, it was clear that the critical point (degree of friability of carbon black) could be ascertained

only by "testing the performance of the product in actual processes of manufacture of products of which carbon black is a component", the disclosure was insufficient, in that conclusions could be reached only after experiments, and not a priori (317 U.S. pages 233–234, 63 S.Ct. page 168).

In Standard Brands, Inc. v. National Grain Yeast Corp., 1939, 308 U.S. 34, 38, 60 S.Ct. 27, 84 L.Ed. 17, the court held the disclosure of the patent too vague and indefinite to constitute invention where the times and manner of the introduction of the additive could be determined only by experimentation.

On insufficiency of the disclosure, see also Goldman v. Polan, 4 Cir., 1938, 93 F.2d 797, 800.

 The claims should point out the limits of the coverage of the patent. Where they do not, they fail in their purpose of describing the boundaries of the invention; within which no one may properly operate unless licensed under the patent; outside of which, the field is open to the public. Where such "no trespassing" signs are not properly posted defining the protected boundaries, the claims are invalid.

United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 63 S.Ct. 165, 87 L. Ed. 232 is again significant. There claims calling for carbon black pellets, being described in the testimony as spheroidal shaped aggregates having "substance and strength" were described as, by the "rough and ready test", those which would "survive under gentle rubbing of the fingers". Further testimony fixed the diameter size of the aggregates as approximately one-sixteenth of an inch, but also as encompassing anything from one-fourth of an inch to one one-hundredths of an inch. This was, quite understandably, held to be too indefinite for validity.

In Barkeij v. Lockheed Aircraft Corp., 9 Cir., 1954, 210 F.2d 1, 2, claims reciting relatively small volume, substantially diametrically opposite, substantially closer than, were held defective.

See also the following cases, in which the disclosure and/or the language of the claims were held to be insufficient and inadequate.

B. B. Chemical Co. v. Cataract Chemical Co., 2 Cir., 1941, 122 F.2d 526, 529–531—"high viscosity"; ranging from 100 to 1000 plus, as the user might find would give the desired results.

Hastings Mfg. Co. v. Automotive Parts Co., D.C.W.D.Mich.1941, 39 F.Supp. 319, 326–327, aff'd. 6 Cir., 1943, 134 F.2d 404; "low total pressure" and "high unit pressure."

General Motors Corp. v. Estate Stove Co., 6 Cir., 1953, 201 F.2d 645, 656; "substantially even distribution of heat" and "substantially greater capacity".

Steel Wheel Corp. v. B. F. Goodrich Rubber Co., D.C.E.D.Mich.1948, 27 F.2d 427, 431–433; "substantially", "substantial."

Myerson v. Dentists' Supply Co., D.C. S.D.N.Y.1946, 66 F.Supp. 31, 38; "substantially complete transparency."

See also, Vitamin Technologists, Inc. v. Wisconsin Alumni Research Foundation, 9 Cir., 1945, 146 F.2d 941, 949–951.

Slayter & Co. v. Stebbins-Anderson Co., D.C.Md.1940, 31 F.Supp. 96, 105, aff'd. 4 Cir., 1941, 117 F.2d 848.

Todd v. Sears, Roebuck & Co., 4 Cir., 1954, 216 F.2d 594.

III. Representations in the Patent.

1. Examples of alleged specific embodiments of the invention.

The file wrapper in the prosecution of the first application at least indicates that it was desirable, or perhaps necessary, to incorporate in the specification some specific example of the process and product to be claimed in the patent in suit. In the specification in the patent in suit, there are eleven examples, preceded by the statement that they are "examples of specific embodiments of the invention." The only one discussed at length in the trial was Example A.

In the course of his testimony, the plaintiff stated that Example A was "an

actual experience".[15] It relates to a mixture of potash soda chips with a moisture content a fraction about 11 per cent, which was ultramilled at a temperature between 100°F and 120°F "so that there was no danger of crystalline reversion." The resulting product had a viscosity of 150 on the Harrington viscosity engine, and the bars when compacted had a moisture content of 11 per cent. Subsequent examination of Marshall developed the fact that the example in question was not an actual one, but was what the witness characterized as an averaging of fifteen runs. He further testified that he did not believe he could duplicate the process and results given in Example A, since there were so many variables, any one or more of which might vary in any particular run. He admitted that this was not truly an example, but was a "hypothetical ideal."

It further developed that of the eight runs actually offered in evidence from which it was claimed that Example A was prepared, five of the runs were at 120°, and one was at 165°, all which would have been in excess of the crystalline reversion point.

2. Moisture content.

Example A related to a mixture which before milling was "a fraction about 11 per cent" and that after milling had a "moisture content of 11 per cent * *." The example continues:

"In explanation of the slightly indefinite 11% plus definition of the moisture content of the mixture at the time it was ultramilled, it is pointed out that the determination of moisture content was made after the product had been formed into a bar, and that at the temperatures involved, i. e., less than 120°F (the crystalline reversion point) the loss of moisture during milling is inconsequential ranging from one tenth of one per cent to one-half of one per cent."

In fact, of the actual runs offered in evidence from which plaintiff claimed he averaged Example A, the moisture content before and after milling was given in only three instances. In the first, which plaintiff described as representative of the best bar he ever produced, the moisture before milling was 13 per cent, and after milling was 6 per cent. In another instance, the moisture before milling was 9.5 per cent and after milling was 7.5 per cent; and in the third instance, the moisture before milling was 7 per cent, and after milling was 6 per cent. Certainly by no possible known means of averaging or reasonably equating could these variations be described as "inconsequential ranging from one tenth of one per cent to one-half of one per cent."

The plaintiff also testified that the remaining ten examples were likewise an averaging process and none of them represented an actual experiment or run.

There is no way in which the court can determine whether or not the inclusion of these examples in the patent application resulted in the issuance of a patent which would not otherwise have issued. It is, however, clear that the examples were designed to affect the prosecution of the patent in the Patent Office, and were likely to have that effect. It would seem apparent that a Patent Examiner who was told that "not only do I claim this can be done, but I have done it" would be far more inclined to pass a patent to issue than would be the case if he had unresolved doubts about whether the patent would or would not work.

It is not necessary for the court to decide the question as to whether or not the above inaccuracies would amount to fraud, and if so whether this could be used as the basis for invalidating the patent in a civil suit as distinguished from a direct proceeding by the United States for recission of a patent. United States v. American Bell Telephone Co., 1897, 167 U.S. 224, 17 S.

15. The court's notes were that Marshall testified that Example A was an "actual *experiment*"; the transcript reads "actual experience."

Ct. 809, 42 L.Ed. 144; United States v. Standard Electric Time Co., D.C.Mass. 1957, 155 F.Supp. 949, app. dism. 1 Cir., 1958, 254 F.2d 598. Nor if these were the only grounds would the court be inclined to deny relief on the "unclean hands" maxim (Precision Instrument Mfg. Co. v. Automotive M. Mach. Co., 1945, 324 U.S. 806, 814–816, 818, 819, 65 S.Ct. 993, 89 L.Ed. 1381; Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 246–247, 250, 64 S. Ct. 997, 88 L.Ed. 1250; Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293). These flagrant inaccuracies—to use the most charitable characterization—do, however, greatly weaken, if they do not completely neutralize, the statutory presumption of validity arising from the mere issuance of the patent.

IV. Novelty; State of the Art; Defendants' practices.

There is no claim that any prior publication constitutes a direct anticipation of the patent in suit. The defendants do claim that the prior art disclosed all, if anything, that is disclosed in the patent; and that defendants have before the date of the alleged invention practiced that which, if the patent were valid, would have been an anticipation (Peters v. Active Mfg. Co., 1889, 129 U.S. 530, 537, 9 S.Ct. 389, 32 L.Ed. 738). It is also claimed by defendants that the practice of the processes disclosed would not produce a bar of soap with the characteristics claimed by plaintiff.

1. Novelty.

The patent teaches that the addition of potash is a milling promotion agent. As construed by plaintiff in his testimony, this meant that the addition of potash softened the soap mixture sufficiently to permit it to be worked on ordinary milling machinery, at lower temperatures than could otherwise be used; and that it served to reduce wet cracking, but still resulted in a firmer soap.

The references cited at the end of the patent are three United States patents and two foreign patents. The court has no quarrel with the conclusion of the Patent Office that the teachings of these patents would not lead one to the practices and product disclosed in the Marshall patent. However, the Patent Office did not cite, or have called to its attention, the following:

(a) Shuck Patent Number 1,831,610 issued November 10, 1931, on application filed March 19, 1930. This invention relates to an improved method for the manufacture of soaps of high soap content and low water content, which are stable and durable. This was a frame soap operation, but the patent contains the following language (page 2, lines 116–119): "It is also possible to replace part of the caustic soda with caustic potash in order to produce a product which will *mill* more smoothly and have a finer texture." (Emphasis supplied).

(b) Marshall Patent No. 2,494,891, issued January 17, 1950, on application filed May 2, 1945, for process and apparatus for making floating soap. This is a process for the production of a milled soap. With respect to operating temperatures, the following appears (Column 2, lines 50–52):

"* * * Also, I prefer to keep the cooling water so that the ribbons are maintained at room temperatures—approximately 70° F."

(c) Of very substantial significance is the article by Professors B. Tjutjunnikov, S. Pleschokova and A. Tschernitschkina, Charkov, U. S. S. R., appearing in Seifensieder-Zeitung, for April 30, 1941.[16] This is particularly pertinent, in that Mr. Marshall testified, in connection with the 120° crystalline reversion point disclosed in his patent, and the importance thereof, that during the time when he was studying this problem he came across this article, which caught

16. The parties agreed upon an English translation of this article, from which the following quotations have been made.

his attention, and seemed very much to the point.[17]

In that article, the equivalent of and the significance of a crystalline reversion point is clearly developed. For example (page 14):

"* * * An examination of soap which passed through the plodder shows that in this machine also there was a transition of crystalline soap into a glassy condition. Here again the maintenance of a certain temperature range is necessary for the maximum glazing of the soap mass. The temperature of the soap mass should not exceed a certain limit (glazing temperature) above which it deglazes—crystallizes. On the other hand, the temperature should not be too low, since in that case, the flow pressure of the soap mass could rise sufficiently to cause a stoppage of the 'flow' in the forward cone of the plodder. The transition of crystalline soap into a glassy state under the influence of a mechanical treatment, which causes a plastic deformation of the crystals, is made clear by the following table * * *."

* * * * * *

"This disappearance or reduction of the turbidity can be hastened by storing at an elevated temperature, this temperature being lower, of course, than that at which a transformation of the glassy into a crystalline soap takes place. * * *"

In this connection, it is most significant to note that this same reference to glassy soap appears in the patent in suit. In Column 2, lines 18–20, it is stated that the invention for the first time has made it possible "to produce the much sought glassy or vitreous soap with its characteristic waxy texture by milling or extrusion processes * * *."

(d) In an article in the Indian Soap Journal, April–June, 1944 by Doctor Sadgopal, entitled "Cracking of Toilet Soaps" there is taught that the tendency of soap to crack may be decreased to a very great extent by using potash, and milling at 34°–36° C. (93°–96° F.) This is expressed as follows:

"An interesting fact to be noted in this very connection is the complete absence of any cracking, whatsoever, in good transparent soaps of both European and Indian makes. It may be pointed out here that transparent soaps are generally made by a process which is very similar to the semi-boiled method of soap manufacture.

"The above mentioned remarks also hold good in case of the technical process employed for the production of soft soaps.

"The author tried experiments similar to those mentioned in the previous table by replacing about 15–35 per cent of the Alkali by Caustic Potash, all other factors remaining just the same. It was found that this change of alkali decreases the tendency of the soap cakes to crack to a very great extent." (Page 104).

* * * * * *

"This defect of cracking can be minimized to a very great extent, by the intimate milling-in of a little white potash soap." (Page 106, Indian Soap Journal, Volume 9).

(e) In another article in Volume 11 of the Indian Soap Journal, by Godbole and Shukla, December, 1945, entitled "Some Observations on the Cracking of Soap," there is the teaching that the inclusion of potassium soap produces free lather, reduces the cracking tendency, and facilitates the plodding, inner fusion and mixing of the soap.

With reference to the phenomena of cracking observed in milled toilet soaps only, and not in the unmilled soaps, the authors state that this tendency has been minimized, and that:

"This is effected by adjusting the soap in regard to its higher and lower melting point fatty acid (so-

17. Transcript, page 677.

dium) salts, and by incorporating with the soap mass certain agents which lower its melting point and thus make it soft and pliable. In certain Indian and European toilet soaps (in France especially), a certain amount of potassium soap (soft soap) is deliberately added with a view to produce a free lather, which incidentally reduces the cracking tendency of the soap cake as well. The presence of a certain quantity of potassium soap facilitates the plodding and accelerates the innner fusion and mixing of the soap." (Page 138).

(f) In Vallance "Cracking of Toilet Soaps", in Soap, Volume 14, February, 1938, the following appears:

" * * * In brief, the requirements of soft soap technology should be borne well in mind, in order to provide the milled soap equipment with a base that will inherently suit the toilet soap process and will not tend to cause cracking by crystallization. Excessive drying out of the chips must of course be guarded against, while the intimate milling-in of a little white potash soap (an old soap making trick) also tends to prevent crystallization, but only if thoroughly incorporated. * * * " (Page 73).

That the introduction of potassium soap produces free lather, reduces the cracking tendency, facilitates plodding, innner fusion and mixing; that the milling can be done at room temperature; and that the milling, in order to reach a "glassy" condition, must take place below a critical temperature—the crystalline of glassy reversion point—is all clearly disclosed by the prior art.

2. Practices of the Defendants.

The uncontradicted testimony on behalf of the defendants, which the court accepts as true, is that at their Chicago, Illinois plant, from the fall of 1949 to the middle of 1950, and again from the latter part of December, 1950 through December 1951, commercial Camay was manufactured and sold with a potassium content of 5-6-10 per cent. Also at the Quincy, Massachusetts plant for three months during the last of 1947 and early 1948, commercial Camay was manufactured and sold with 10 per cent potash. From July, 1950 through January, 1954, the use of Potash up to 5 per cent was made optional at all of defendants' plants, in cases in which it was needed to correct wet cracks.

3. Soap as made in accordance with the patent.

The uncontradicted evidence is that soap made in accordance with the processes in plaintiff's patent does not produce any unexpected or extraordinary results.

(a) Tests showed that instead of potash tending to harden the soap, it had the expected characteristic of making the soap softer, and this was true regardless of the temperature (within ordinary operating ranges) at which the soap was manufactured.

Indeed, if it were true that the use of potassium had the hardening effect claimed by Mr. Marshall, it would have been expected that Example 4 in the patent, in which 30 per cent potassium was used—the highest in any of the examples—would have produced the hardest soap. In fact, the viscosity was as low as that appearing in any of the examples.

(b) From plaintiff's own records, it appeared that in no case had plaintiff been able to obtain, in his finished soap, an improvement in all six of the "evidences" of microcrystalline state over the raw material from which the Marshall runs were made. Even with respect to his best run, the cold welding and penetrating (firmness) properties were worse than those of the raw material, and the viscosity was substantially the same.

Therefore, as alternative grounds, the court holds the patent in question invalid as disclosing no novelty; as teaching nothing more than was disclosed by the prior art and as practiced by defendants

**636**

before the date of plaintiff's invention; and as, in fact, not accomplishing that which was claimed for it.

### INFRINGEMENT

Despite the holding of invalidity, the Court, in accordance with what it understands to be the better practice (Sinclair & Carroll Co. v. Interchemical Corp., 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Blish, Mize & Silliman Hdwe. Co. v. Time Saver Tools, 10 Cir., 1956, 236 F.2d 913) will also pass upon the question of infringement; although, having found the patent invalid because of, among other things, its indefiniteness, it is, in a sense, an impossible task. However, assuming that the various "evidences" of an ultramicrocrystalline state can be given meaning, the court is, nevertheless, of the opinion that no infringement has been established for the following reasons:

(1) Dr. Donald H. Andrews, a distinguished scientist, was called as an expert witness on behalf of defendants. He testified that while the term "ultramicrocrystalline" was new to him, he understood it to refer to material below the wave length of light in size. He testified to the study of photographs prepared from very thin slices of various soaps examined through a microscope employing Polaroid filters, as follows:

| Soap | Year | Per cent of Potash |
|---|---|---|
| Camay | 1950 | 4.6 |
| Camay— Quincy, Mass. | 1950 | 4.5 |
| Camay— Baltimore, Md. | 1951 | 0.4 |
| Camay— Cincinnati, Ohio | 1952 | 5.0 |
| Camay— Chicago, Ill. | 1953 | 5.8 |
| Camay— Baltimore, Md. | 1954 | 5.9 |
| Camay— Chicago, Ill. | 1954 | 0.5 |
| Camay— Chicago, Ill. | 1962 | 6.0 |
| Camay— Baltimore, Md. | 1962 | 6.2 |
| Pears | 1961 | 0.0 |
| Lux | 1960 | 0.0 |
| Palmolive | 1961 | 0.0 |
| Dial | 1961 | 0.0 |
| Marshall 232 | 1951 | 17.0+[18] |

In his opinion (a) there was no difference between the various Camay specimens on the one hand, and the Lux, Palmolive and Dial specimens on the other, with respect to the proportion of material in the respective soaps that was made up of crystals large enough to be seen in the microscope; (b) there was no difference between the Camay 1950 and 1951 specimens, and the later ones, with respect to the proportion of material that was above the wave length of light in size; (c) the Marshall 232 bar was made up predominately of material of a dimension greater than the wave length of light; (d) Pears soap was the only one of the above specimens that was ultramicrocrystalline in character; and (e) that as a scientist he would regard the Pears soap as in an ultramicrocrystalline state.

Dr. Andrews further testified that he had examined a series of pictures of a slice of Camay made in the Baltimore, Maryland plant in 1962 and containing 7% potash; that he had plotted a chart from these slides; and that in his opinion not more than 2% of the specimen was made up of material smaller in size than the wave length of light.

If Dr. Andrews is correct in his interpretation of the meaning of ultramicrocrystalline—and the court is convinced that he is; and if "ultramicrocrystalline state" as used in the patent in suit means that (at least) more than one half of the soap crystals are of a size less than the wave length of light—then there obviously is no infringement, and

18. The average potash content of Swan, the soap from which the Marshall bars were milled.

the patent does not teach what it purports to teach.

However, even if ultramicrocrystalline state does not mean what it would appear to mean, Dr. Andrews' testimony still is highly significant. It shows that there was no change in the proportion of crystals above and below the wave length of light (however the latter crystals may properly be denominated) in the pre-invention and post-invention Camay, despite their different potash contents; or any difference with respect to the proportion of material that was made up of crystals large enough to be seen in the microscope between the Camay soaps, all of which contained potash, and Lux, Palmolive and Dial, none of which contained potash; that the Marshall 232 bar was made up predominately of material of a dimension greater than the wave length of light; and that it was possible to make a soap (Pears) all or substantially all of the material in which was smaller in size than the wave length of light.

It would seem to be incredible that plaintiff, under either of the theories set forth in his patent, or on any theory, could have produced a really significant invention, change, development or improvement in soap which would not have been reflected in a scientifically observable and demonstrable difference in the size of crystals above and below the wave length of light, in his own soap, and in the alleged infringing Camay, over pre-"invention" Camay.

(2) The testimony of the responsible officials of the defendants was categorically to the effect that no practice or process of the defendants was in any way based upon or changed because of anything learned from Marshall in any manner. While the court would not be content to rely solely upon what must necessarily be conclusory testimony, the court was impressed by the apparent honesty and candor of these witnesses, two of whom were thoroughly admonished as to the sanctity of the oath in connection with this specific question.

(3) It is not without significance that the jury found that Marshall had not disclosed to the defendants anything with respect to the manufacture of Camay soap that they did not already know. While this determination is, obviously, not binding upon the court, it is persuasive—particularly when it agrees with the court's own conclusions.

(4) The patent is emphatic in its claim for the increased viscosity or firmness of a bar manufactured in accordance with its processes. The testimony is conclusive that the firmness of the Camay bars after the date of the alleged invention has been lower, and at the date of trial was lower, than the firmness of such soap prior to the date of the alleged invention.

(5) Physical demonstrations both by plaintiff and defendants of the immersion of bars showed that there was noticeable swelling both of the Marshall bars and of the Camay bars. This swelling, with respect to the best of the Camay bars, was characterized by Mr. Marshall as being in the nature of 50 per cent more than that of his bar.

(6) All the immersed bars left at least some traces of soap dish gel; most of the Camay bars leaving noticeable traces.

(7) The court has heretofore pointed out the ambiguity as to whether the specification discloses that the use of special patented machinery is necessary for the production of the Marshall bar, or whether it discloses that the Marshall bar can be produced on the ordinary roller mills and other equipment in the plants of the defendants. There is no claim that the defendants have at any time used the special machinery mentioned in the patent.

For the foregoing reasons, the court finds as a fact and concludes as a matter of law that the patent in suit, even if valid, has not been infringed.

In summary, the court finds that United States Patent 2,724,702 in invalid, and specifically that Claims 1, 2 and 3

thereof are invalid;[19] and that if valid said claims have not been infringed.

The foregoing is intended to embody the court's Findings of Fact and Conclusions of Law pursuant to F.R.Civ.P. 52(a). Should either side desire other or more specific Findings of Fact or Conclusions of Law, they may be submitted within ten days from the filing of this opinion; otherwise a decree in conformity therewith may be submitted for signature.

---

19. It therefore becomes unnecessary to decide whether or not Patent 2,724,702 is truly a continuation-in-part of application Serial No. 271,060, filed February 11, 1952. The court is of the strong impression that it is not.